DELANEY et al, *Appellants,*
*v.*
GEORGIA-PACIFIC CORPORATION et al,
*Respondents.*
(No. 422-128, SC 24501)
564 P2d 277

[ 306 ]

[ 306-a ]

Barnes H. Ellis and Karen K. Creason, of Davies, Biggs, Strayer, Stoel and Boley, Portland, argued the cause and filed briefs for appellants.

Norman J. Wiener, of Miller, Anderson, Nash, Yerke & Wiener, Portland, argued the cause for respondents. With him on the brief were Peter C. Richter and James N. Westwood, Portland.

Before Denecke, Chief Justice, and Holman, Tongue, Howell, Bryson, Mengler and Bradshaw, Justices.

DENECKE, C. J.

## DENECKE, C. J.

Plaintiffs appeal from an adverse decree in a suit arising out of the conduct of a joint venture. We reverse in part and remand for further proceedings.

Montana Pacific International (MPI) is a corporation formed to carry out a joint venture. One half of its stock was subscribed to by Montana Lumber Sales (MLS) and the other half by Georgia-Pacific Corporation (GP).[1] MLS is a closely-held Montana corporation, owned in part and controlled by plaintiffs Donald Delaney and Robert Delaney. The Delaneys, MLS, its associated companies, and certain key MLS employees are referred to in the record as the "Montana group," and we will adopt that usage for convenience.

The Montana group, prior to 1974, had experience and prospects for timber acquisition in Montana and Canada, but was heavily in debt and needed capital. GP had money, access to financing, and an extensive wood product marketing network. On February 6, 1974, MLS and GP executed a "Joint Venture Agreement" creating a joint venture to be known as Montana Pacific International. The venture was for an indefinite term; its purpose was stated to be:

> "* * * [A]cquiring Assets, conducting the business of managing and harvesting forest growth, manufacturing, buying, selling, and generally trading and dealing in timber, logs, lumber, and wood products other than plywood, pulp and paper * * *."

The agreement also provided that each party's interest would be 50 per cent. They were to share equally in overall management responsibility, but the Montana group was to have "operating responsibility for the management of all Assets of Joint Venture, including,

---

[1] The formal parties to the joint venture are Rocky Mountain Timber Corporation, a wholly-owned subsidiary of MLS and O.P.M. Co., Inc., a wholly-owned subsidiary of GP. No one contends that the interposition of these subsidiary corporations has any significance for purposes of this case. We will, therefore, treat MLS and GP as the joint venturers in name as well as in fact.

but not limited to the types of products to be manufactured and supervision of the day to day operations." Each party's capital contribution was to be $1.5 million. GP agreed to use its best efforts to obtain additional financing and both parties agreed to guarantee the venture's debts.

Some time in the spring of 1974 the Montana group learned that a "timber package" they had sold in 1973 to Louisiana Pacific Corporation (LP) might be available by purchase or assignment. This "package" consisted of cutting rights to Montana timber which was under diverse ownership. The Montana group had negotiated contracts with the individual owners and had then transferred the cutting rights to LP, which agreed to cut 45 million board feet per year and to pay MLS $18 per thousand board feet. Robert Delaney, learning that LP might be willing to reconvey the package, or a portion of it, to MLS, informed GP that this was a possible business opportunity for the joint venture. GP agreed that the possibility should be followed up.

After a period of complex negotiations, MPI and LP executed, on June 24, 1974, a "Timber Cutting Contract" conveying to MPI the timber remaining uncut by LP. MPI agreed to pay LP $40 per thousand board feet for the merchantable timber covered by the contract. At the same time MPI purchased from LP an existing sawmill near Roundup, Montana, and the site for a potential mill at Lewistown, Montana. It was contemplated by the joint venturers that MPI would reconstruct or replace the Roundup mill and would construct a new mill at Lewistown in order to process the timber as it was cut.

In the meantime they had also determined to incorporate MPI. The incorporation and the LP transaction were consummated at the same time. The contract with LP was, therefore, executed by MPI, a Montana corporation. The corporation was required to make cash payments totaling $7,350,000 to LP at

closing: $650,000 for the Roundup and Lewistown mill sites, and $6.7 million as a "deposit" to be applied, at the rate of $20 per thousand board feet, to the price of the first 335 million board feet cut by MPI. This cash payment was made by the parties' capital contributions to the joint venture corporation and by obtaining a loan from the Bank of America in the amount of $4.5 million, payable in six months.[2]

MPI then proceeded with construction of the new mill at Roundup. The Montana group undertook on-site responsibility for the mill's design and construction, and also acquired additional timber cutting rights for MPI. The mill was substantially completed by March 1975 at a total cost of approximately $4.35 million. Construction and operating costs during this period were met by advances from GP to MPI.

Also during this period, however, conflicts developed between the parties about control of the mill, the handling of the venture's financing, and the details of management. The discord became critical by May of 1975 and the parties have, since that time, been unable to agree upon the proper conduct of the venture. The venture has not been a financial success. The Roundup mill has always operated at a loss; the Lewistown mill has not been constructed. MPI is heavily in debt to GP, the timber contracts purchased from LP are approaching expiration, and the entire future of MPI is highly doubtful.

This suit was filed in October 1975. Plaintiffs, suing both individually and derivatively on behalf of MPI, have charged GP with breaches of its fiduciary duties as a joint venturer. GP denied any liability for the alleged breaches, and counterclaimed for $703,000, plus interest on notes representing loans to MLS.

---

[2]MPI was incorporated with a capital of $3 million. GP contributed its $1.5 million in cash. MLS borrowed $675,000 from GP, and the balance of its contribution from a third party. To secure the loan from GP, MLS pledged to GP its shares in MPI.

The trial court held that plaintiffs were not entitled to any relief, and decreed that GP was entitled to judgment on its counterclaim. Plaintiffs appeal, contending that the trial court applied incorrect legal standards to the facts, and that under the proper legal principles they are entitled to equitable relief or damages, or both.[3]

## The Appropriate Legal Standards

■ As partners or joint venturers, plaintiffs and GP owed one another a duty of loyalty, fair dealing and full disclosure in all matters affecting the conduct of the venture's business. *Starr v. International Realty,* 271 Or 396, 403, 533 P2d 165 (1975); *Dean Vincent, Inc. v. Russell's Realty,* 268 Or 456, 466, 521 P2d 334 (1974); *Fouchek v. Janicek,* 190 Or 251, 262, 225 P2d 783 (1950). This duty continued throughout the parties' relationship. In *Fouchek v. Janicek, supra* (190 Or at 273), we said:

"* * * The obligation of partners to act with the utmost candor and good faith in their dealings between themselves is not lessened by the existence of strained relations between them, or the existence of any condition which might, in and of itself, justify the firm's dissolution. The fiduciary obligations of a partner remain until the relationship is terminated. * * *."

■ Some question has been raised about the effect of the incorporation of MPI upon the parties' fiduciary obligations. The corporation was formed for purposes of facilitating dealings with outsiders, and was not intended to place the parties to the joint venture on an arms-length basis with one another. Of course, to the extent that the articles of incorporation, bylaws, and

[3] Although MPI is a Montana corporation and its business activities are centered there, the parties have assumed that their rights and duties are governed by Oregon law. GP is a Georgia corporation with its principal place of business in Oregon. Many of the negotiations between the parties took place in GP's offices in Portland. The joint venture agreement was executed there. MLS is a Montana corporation. Rocky Mountain Timber Corporation and O.P.M. Co. (see note 1, supra) are both Oregon corporations. Under the circumstances, and in the absence of any reason to believe that the choice of law would affect the result, we have adopted the parties' assumption that Oregon law applies.

shareholders' agreement specifically alter the parties' rights and duties, these later documents control over the earlier joint venture agreement. They do not, however, purport to dissolve the fiduciary relationship.

Whether we consider the corporation as organized to carry out the purposes of a continuing joint venture,[4] or simply regard the parties as equal owners of a close corporation, their relationship was such that each was entitled to the other's performance of fiduciary duties of loyalty, good faith, and full disclosure. *Baker v. Commercial Body Builders,* 264 Or 614, 629, 507 P2d 387 (1973).

We agree with the trial court that some of the alleged breaches by GP, whether or not they were in fact violations of duty under the appropriate legal standard, did not result in any ascertainable damage to MPI. This opinion will not, therefore, discuss all of the parties' charges and countercharges. We will deal only with the matters which we consider necessary to an understanding of our disposition of the case.

### Changes in Terms of MPI's Debt Financing

In order to make the cash payments to LP required at closing, MPI had to borrow money. GP personnel secured $4.5 million for this purpose for MPI from the Bank of America. The GP personnel informed the Montana group that they had borrowed this amount for six months and had signed a note. The Montana group never saw the note and apparently was not informed exactly when the note was due except some time in December 1974. GP guaranteed the loan.

The intention of GP at the time of the loan, which was expressed to the Montana group, was that when this note became due it would be renewed for a longer term, 3 to 5 years. The renewal would be guaranteed by GP which would also guarantee loans to MPI of

---

[4] See, e.g., *Arditi v. Dubitzky,* 354 F2d 483 (2d Cir 1965), *Jolin v. Oster,* 55 Wis2d 199, 198 NW2d 639 (1972).

larger amounts. GP's action and intention were pursuant to paragraph 4(b) which provides, in part: "MPI may borrow funds for the acquisition of assets and for working capital. OPM [GP's subsidiary] shall use its best efforts to assist MPI in borrowing such funds and each of the parties agrees to jointly and severally guarantee payment of any loan or loans to MPI."

Harry Kane was GP's, and also MPI's, executive vice president of finance and a member of MPI's board of directors. On December 19, 1974, about a week before the 6-months note was due, and in the absence of any demand by Bank of America, Mr. Kane caused GP to pay the Bank of America loan. He also had a demand note to GP executed on behalf of MPI in the amount of the payoff by GP.

It is undisputed that Mr. Kane took these steps without consulting MPI's board of directors (which had met only two days earlier, on December 17) and without informing the Montana group of his intentions.[5] It is also undisputed that he did this without informing MPI's board of directors or the Montana group that in October 1974 GP had approved a guarantee to the Bank of America of any indebtedness of MPI up to $10 million.

In the minutes of the GP board of directors' meeting at which this guarantee was approved, the chairman and Mr. Kane stated that it was necessary in conjunction with the purchase from LP to make this guarantee. We interpret this statement to mean that the guarantee was required under the obligation GP assumed under paragraph 4(b) of the shareholders' agreement previously quoted.

■ When a guarantor is required to pay a debt it has

---

[5] How Mr. Kane managed this transaction without informing the Montana group is a mystery to us. The signature of the treasurer, Wayne Knutson, a member of the Montana group, appears from the corporate records to be required for the execution of MPI's notes. Nevertheless the testimony of Mr. Kane is clear that he took these steps himself, and that he did not inform the Montana group until later.

guaranteed, the guarantor has a right to payment from the debtor. However, in this case there is no evidence the bank required payment from GP or MPI. The strong inference is to the contrary. At the time the note was paid, GP's guarantee was on file with the bank and it would have covered any renewal or extension of the loan. The trial court found the bank was prepared to lend funds to MPI on the basis of this. The expectation of the Montana group, as expressed in the shareholders' agreement, was that GP would arrange longer term financing.

■ GP contends that it had a right to pay off the Bank of America loan under the terms of the shareholders' agreement executed upon the incorporation of MPI. The section of the agreement relied upon by GP provides:

"* * * If either party pays any debt of MPI, the other party shall reimburse such party for any payment in excess of one-half of such debt; provided, however, that no prepayment of term indebtedness shall be made without the mutual consent of the parties. * * *."

We do not construe this provision to authorize GP to pay the Bank of America loan and substitute a demand note without the knowledge or approval of the MPI board of directors and without notifying MPI of possible alternative financing.

The agreement provides that the business and affairs of MPI are to be managed by a six-member board of directors, and that GP and MLS are each to have the right to designate three of the directors.

■ It is not, of course, a breach of fiduciary duty for a joint venturer, or a stockholder in a close corporation, to loan money to the enterprise. However, the re-financing of a debt in excess of $4.5 million is a major item of business; the terms of such a refinancing were a proper matter for determination by the board of directors. MPI's board, including the Montana group's nominees, should have been informed that the $10 million loan guarantee was in the hands of the Bank of

America and should have been given an opportunity to explore the possibility of long-term bank financing. Instead GP appropriated to itself the power that inevitably accrues to a creditor who is in a position to call in a major debt at any time.

■ We have been cited to no authorities which are in point. It has been held that corporate insiders may not profit financially from a private purchase of a corporation's liabilities when they had a duty to acquire them for the corporation. *Young v. Columbia Land & Inv. Co.,* 53 Or 438, 99 P 936, 101 P 212 (1909). See, generally, 3 Fletcher Cyclopedia Corporations §§ 868-869 (1975 Repl Vol). Although there is here no question of financial profit to GP (except in the matter of interest rates, discussed below) the fiduciary principle is, in our opinion, the same. GP obtained significant financial leverage in the management of MPI without the authority of MPI's board of directors and without informing the board that alternative possibilities existed. This transaction was a clear breach of duty on the part of GP.

## *Interest Charged MPI by GP*

■ The parties had, of course, understood from the outset that GP would make some cash advances to the joint venture. Although the interest rate to be charged on these advances was never the subject of an express written agreement, there was ample evidence of an understanding that the charge would be from ¼ per cent to ½ per cent over the Bank of America's prime rate. Until December of 1974, GP carried the interest owed by MPI on its books at the rate of ¼ per cent over the prime rate. On December 19 Mr. Kane directed GP's accounting department that MPI was to be charged interest at 2 per cent above the prime rate, that interest was to be compounded monthly, and that both of these charges were to be made retroactive to July 10, 1974, the date of GP's first cash advance to MPI.

These changes had not been discussed in advance with the Montana group or at the December 17 board meeting. When he learned of these changes Wayne Knutson, a member of the Montana group and MPI's treasurer, protested, but GP has continued to charge MPI interest on all advances at 2 per cent over the Bank of America prime rate, compounded monthly. At the time of trial no payments on principal or interest had been made.

The evidence was conflicting as to whether payment of this rate of interest would result in a profit to GP. Mr. Kane testified at length about the cost of GP's own financing, and the trial court found that there was no profit to GP. We will accept this finding for purposes of this opinion, although there was persuasive testimony to the contrary.

It is true, as the trial court observed, that GP had not promised to finance MPI indefinitely at a loss to itself. However, GP was not justified in ignoring its original agreement to provide financing at ¼ or ½ per cent above prime and in unilaterally imposing a higher interest charge retroactively on all advances. Nor was it entitled to compound the interest in the absence of any agreement to that effect.

We consider the fact that the original interest rate on GP's books was ¼ per cent above prime to be convincing evidence that this was GP's understanding of the original agreement. We hold that GP is entitled only to simple interest at that rate on all advances to MPI until the time that the Montana group acquiesced in the higher interest charges. On remand, the trial court will have to determine the appropriate date.[6]

### Contractual Concessions to Louisiana Pacific

■ Georgia-Pacific personnel, negotiating on behalf of MPI for the purchase of the LP timber package, agreed

---

[6]There is evidence that at some undisclosed time after December 19, 1974, members of the Montana group, acting as officers of MPI, signed notes incorporating the higher rate.

to certain contractual terms which were solely for the benefit of LP and which increased the risk of the transaction to MPI.[7] This was done without disclosing the facts to the Montana group or to the MPI board as a whole. The trial court so found.

The 1973 contract between the Montana group and LP provided for a $2 million "refundable deposit" which was paid by LP on execution of the contract. It was to be applied, at the rate of $4 per thousand board feet, to the purchase price of the timber as it was cut, up to 500 million board feet. If the recoverable timber proved to be less than 500 million board feet, the unamortized portion of the deposit was to be refunded to LP.

The 1974 contract between LP and MPI contained a comparable provision for an initial cash payment by MPI of $6.7 million, which was to be applied, at the rate of $20 per thousand board feet, to the purchase price of the timber as it was cut, up to 335 million board feet. This payment was labeled in the contract a "refundable deposit," as it was in the 1973 contract. However, unlike the 1973 contract, the 1974 contract contained no provision for a refund to MPI of any portion of that "deposit" in the event the recoverable timber did not total 335 million board feet. The contract was drafted in this form in order to permit LP to take, at a later time, whatever position as to refundability of the payment it might determine to be most advantageous for tax purposes.

Thus, the contract was written, for LP's benefit, in deliberately ambiguous language, and the ambiguity and its possible adverse effect on MPI were concealed from the Montana group. On appeal GP has neither denied that its representatives concealed this aspect of

---

[7] LP was organized as a public-issue corporation in 1973 as part of a "spin-off" of portions of the GP organization pursuant to an order of the Federal Trade Commission. There is evidence that certain GP personnel who were active in MPI's affairs had undisclosed interests, both direct and indirect, in LP's shares.

the negotiations with LP, nor attempted to justify the contractual provisions as the price of any reciprocal benefit to MPI. Although the written contract was presented to MPI's board for approval, it is not surprising that the unwary members of the Montana group did not notice the ambiguity. It was designed not to be noticed.

GP has tendered no excuse for this breach of duty, and we can conceive of none. GP does contend, accurately, that there is no showing of actual or probable financial loss to MPI as a result of these terms of the LP contract. In fact, plaintiffs have consistently taken the position that there is no shortage of recoverable timber on the contract lands. That is not the point. The decision whether the risk of loss was so slight that MPI could bear it solely to provide LP with a tax advantage was one in which the Montana group was entitled to share.

■ Although not the direct cause of any loss to MPI, GP's secret concession to LP did play a part in a related matter of which plaintiffs also complain.

The original sale of timber cutting rights from MLS to LP included the assignment by MLS of its interest in a ranch, and the timber thereon, which it was purchasing under a land sale contract. The sales contract stated the assignment was "To secure payment of any refund which may be due to Buyer [LP] from Seller [MLS] under the terms of Paragraph 4.1 [the provision for the refundable deposit] * * *." The trial court found the parties originally contracted and intended that this assignment was to be only for security purposes; however, later the timber on the ranch was included in the list attached to the cutting contract. We find the assignment was solely for security purposes.

After the terms of the sale from LP to MPI had been agreed upon, GP personnel learned that GP foresters believed the quantity of merchantable timber on the

LP contract lands might be considerably less than 335 million board feet, the minimum quantity upon which MPI's cash payment of $6.7 million to LP had been calculated. GP then informed the Montana group that the timber on the MLS ranch would have to be sold to LP at $18 per thousand board feet (the base price under the 1973 contract between MLS and LP) so that it could be included in the LP conveyance to MPI. The Montana group objected to this transaction, insisting that the ranch timber was an asset of MLS and that, except for its assignment for security purposes, it was no part of the LP "package." Without explanation, GP insisted that unless the ranch timber was conveyed to LP at the 1973 contract price, GP would not agree to the consummation of the LP transaction. Under protest, the ranch timber was conveyed to LP.

Certainly the effects of this transaction were not concealed: MLS was required to sell its timber at $18 to LP, which in turn sold the timber to MPI at $40. When plaintiffs agreed to this transaction they clearly understood what they were doing, although they were not informed why GP insisted that it be done. The trial court held that they executed the conveyance with a full understanding of its consequences and that there was no duress or fraud in the transaction of a kind which would warrant relief. However, GP never revealed to the Montana group that because the "refundable deposit" was not refundable, if the timber ran below 335 million board feet MPI would lose a portion of its $6.7 million deposit and GP would bear one-half of this loss.

In *Starr v. International Realty, supra* (271 Or at 405), we recognized as the established, and the "better," rule that the absence of "deception or fraud" is not sufficient to justify a partner in acquiring an interest in partnership property adverse to that of the firm, and that only full disclosure of all relevant facts would suffice. Similarly, the mere absence of fraud as to the nature of the timber conveyance does not justify

GP's insistence upon it as a condition of the consummation of the LP transaction. Plaintiffs were entitled to know the real reasons for GP's adamant stand. Had those reasons been made clear, it is possible that plaintiffs, because of their own cash needs, would have chosen to go ahead with the LP transaction on those terms in hopes that MPI would soon be operating profitably. We cannot assume, however, that that would have been the case.

GP has not suggested any explanation for its insistence upon this conveyance other than that advanced by plaintiffs: that a shortage of timber under the contract would result in a loss to MPI and that this was known to GP but had been concealed from plaintiffs. To protect MPI against possible loss as a result of GP's secret concession to LP, plaintiffs were persuaded to sell their timber at $18 per thousand board feet, MPI became contractually obligated to cut and pay for that timber at $40 per thousand board feet, and LP was given a windfall profit of $22 per thousand board feet.

This transaction cannot be undone in the present case. LP is not a party to this case. Although it has assigned the cutting contracts to MPI, it still retains the right to payment for all merchantable timber cut from the lands covered by the contract. We cannot in this case, divest LP of its right to receive payment at the contract rate as the ranch timber is cut. This does not mean, however, that no relief is available.

GP is responsible for inducing plaintiffs to sell their ranch timber to LP at $18, without full disclosure of important facts. That price was far below the value of the timber at that time, and resulted in a windfall profit to LP. Plaintiffs cannot be restored to ownership of their timber in this case, but they are entitled to recover the damages resulting from this transaction. On remand, the trial court shall determine the quantity of timber involved, and shall enter judgment for plaintiff in the amount of the difference between the

price to be received by LP and the price received by plaintiffs.[8]

## Chip Prices

■ On September 24, 1974, MPI and GP entered into a "Wood Chip Contract." MPI agreed to sell, and GP to buy, all wood chips produced by the MPI mill at Roundup and the proposed mill at Lewistown. The price was to be determined by a formula based on the chip export price received by GP under an existing contract with Marubeni Corporation. MPI was to be notified, at stated intervals, of changes in price under the Marubeni contract.

A few months later the export chip market suffered substantial changes and GP, as a consequence, renegotiated its ship export contracts. Marubeni Corporation, in return for a reduction in the quantity of chips it was obliged to buy, agreed to a substantial increase in the unit price. It is undisputed that MPI was never notified of this price change, and that its board, therefore, did not know that the base price under MPI's September agreement with GP would be significantly higher than in the past.

The Roundup mill did produce some chips which were purchased by GP; the record is not clear whether MPI actually received the higher price to which it was entitled. Plaintiffs contend, however, that if MPI had been properly notified of the increase in the contract price, its production plans for the Roundup mill would have been different. Under the September 24 agreement, MPI had in GP a guaranteed buyer for its entire chip output. There was evidence that many of the logs available at the Roundup mill were not suitable for the manufacture of lumber, but might have been chipped for profitable sale to GP had the increase in the contract price been known.

We are inclined to accept plaintiffs' argument that

---

[8]The judgment will be in favor of Mid State Development Corporation, the Delaney company which was the owner of the ranch timber.

the probable reason that GP did not inform MPI of the increase in the export chip price was that GP already had more chips than it could sell under its renegotiated export contracts. By concealing this information from MPI, plaintiffs contend, GP was improperly elevating its own interests over those of the venture.

Although the evidence does not permit any realistic estimate of the financial loss to MPI as a result of GP's failure to inform MPI of the increase in contract prices, we find that this failure was a breach of GP's fiduciary duties as well as its contractual obligations.

*Refusal to Agree to Construction of Lewistown Mill*

Plaintiffs contend that one of the major reasons for the financial failure of MPI has been GP's refusal to approve prompt construction of the Lewistown mill. Plaintiffs insist that a second mill at Lewistown was essential to the efficient utilization of the total timber package purchased from LP. They further contend that the need for this mill was understood from the beginning of MPI's involvement in the LP transaction, and that GP has nevertheless repudiated this understanding and refused to finance the construction of that mill. As a consequence, plaintiffs argue, the contract timber cannot be cut and processed before the contracts with the timber owners expire. We have reviewed the record and have found no evidence of an unconditional agreement to construct the Lewistown mill at any given time. It is clear that construction of the mill was a part of the parties' general plans for MPI. It is also clear, however, that GP has consistently taken the position that the Lewistown mill would be constructed only after the Roundup mill was completed and proved to be satisfactory. When initial results from the Roundup mill were disappointing, GP members of the MPI board refused to approve construction of the Lewistown mill.

The parties presented considerable evidence about the reasons for the early losses from operations at the

Roundup mill; it is not necessary for us to determine where the blame for these losses lies. It is enough to conclude, as we do, that there is no evidence that GP was motivated by anything but legitimate business concerns when it refused to approve the construction of a second mill while the first was operating at substantial losses. Perhaps it is true, as plaintiffs contend, that it would have been better business judgment to proceed immediately with the construction of both mills. However, GP never agreed unconditionally to proceed with construction of the Lewistown mill at any particular time and there is no showing that it acted in bad faith in refusing to agree to finance its construction. We find no breach of duty in this respect.

### Expulsion of Montana Group from Management

On May 28, 1975, at the annual MPI shareholders' meeting, Robert Flowerree, the new president of GP, was elected to MPI's board of directors to replace Robert M. Pamplin, GP's outgoing president. The newly-elected board of directors then met and unanimously elected officers for the following year.[9] Immediately after the election of officers Mr. Flowerree, who presided at the board meeting, abandoned the previously announced agenda and turned the meeting over to Mr. Kane who presented to the board a proposed curtailment plan designed to cut MPI's costs and reduce its losses. This proposal called for the termination of the employment of Robert Delaney and Wayne Knutson. The Montana group was surprised and upset by these proposals, and the meeting adjourned, after protests by the Montana group and some

---

[9]These officers were:

| | |
|---|---|
| Chairman and Chief Executive Officer | Robert E. Flowerree (GP) |
| President and Chief Operating Officer | Robert L. Delaney (Mont) |
| Executive Vice President—Finance | Harry J. Kane (GP) |
| Vice President | Donald L. Delaney (Mont) |
| Vice President | Clifford C. Rawlings (Mont) |
| Secretary | Ralph M. Davisson (GP) |
| Treasurer | Wayne K. Knutson (Mont) |
| Assistant Treasurer | Marion L. Talmadge (GP) |

discussion, without any formal action on the matter. There followed a series of special board meetings at which the parties attempted to work out some accommodation. These attempts were not successful, and this lawsuit followed.

During the period after the May 28 meeting GP substantially took over all management of MPI. Although the Montana group members remained on the board and on MPI's payroll, policy was dictated by GP. On June 20, according to the trial court's findings:

> "* * * GP stated that it was placing its representative, Dewey Mobley, at Roundup to check on and oversee the operation, leaving Clifford Rawlings in charge. Mr. Floweree informed Mr. Robert Delaney and Mr. Donald Delaney that they were not to communicate with any employees at the mill as to how to run the mill operation and that they were not to carry on the MPI timber acquisition program. Following that meeting, the Montana officers were removed as authorized signatories on all checking accounts of MPI, and from and after that date the Montana officers have been effectively precluded from functioning as officers of MPI."

MPI's bylaws provide that the Chairman (Mr. Flowerree) is to be the chief executive officer, with "general and active control of its business and affairs," and that the President (Robert Delaney) is to be the chief operating officer and shall, "subject to the direction of the Chairman and the Board of Directors, * * * have general management of its business properties and affairs." Removal of any officer may be accomplished by a vote of a majority of the whole board of directors.

■ Other bylaw provisions permit ordinary business to be transacted by a majority of a quorum of the board. The separate provision for removal of officers only by a majority of the whole board is, we believe, of significance, particularly in light of the provision in the shareholders' agreement that each party has the right to designate three members of the six-member board of directors. The apparent intent of the parties

[ 323 ]

was to make it impossible for an officer to be removed by one party's designees on the board. Robert Delaney was not formally removed as president of MPI on June 20, but since that date he has been prevented by GP from performing the responsibilities of his office. The fact that the bylaws provide that the president is to exercise his general management responsibilities "subject to the direction of the Chairman and the Board" does not authorize the chairman to strip the president of his entire authority. A decision of that magnitude is tantamount to his removal, and could be authorized only by a majority of the board.

■ GP has contended that the Delaneys were bad managers of MPI's operations, spending money unnecessarily on travel, exercising poor judgment in matters of timber acquisition, and failing to exercise proper fiscal controls. The trial court, in general, agreed with these contentions. Assuming these charges are true, they are not a justification for GP to take over the entire management of the enterprise in violation of the parties' agreement to share management authority equally.

■ Although we are not convinced that there was, as plaintiffs contend, a complete takeover by GP on May 28, we find that GP effectively ousted the Montana group from management of MPI on and after June 20, that this ouster was unjustified and was a violation of GP's fiduciary duties, and that as of that date, considering the prior pattern of GP's high-handed behavior in relation to the venture, plaintiffs were entitled to dissolution of MPI. The relief we direct is premised on this conclusion.

■ In *Baker v. Commercial Body Builders, supra* (264 Or 614), we pointed out that when those in control of a corporation have engaged in conduct which is oppressive toward other shareholders, an equity court obtains jurisdiction under ORS 57.595 to decree dissolution if the circumstances warrant, or to fashion other appropriate equitable relief "[d]epending upon the

[ 324 ]

facts of the case and the nature of the problem involved * * *." 264 Or at 631-632. In the present case it appears that dissolution and liquidation, always a harsh remedy, would be particularly hazardous to the interests of MPI's owners. Its major assets are the LP timber cutting contract and the Roundup mill; the values of these assets are interdependent. The contracts with the timber owners will expire at varying times in the near future. If anything is to be salvaged from this venture, quick action by persons familiar with the operation is necessary.

Plaintiffs prayed for a decree that GP be required to purchase their shares in MPI at a "fair and equitable price * * * reflecting the values thereof had GP performed in a timely manner its representations and promises made at the inception of the joint venture, and conducted the operation in the best interests of MPI * * *." As evidence of the appropriate value plaintiffs point to a "pro forma" projection of MPI's anticipated profits over a 10-year period, prepared by GP in support of an application for bank financing.

We find these projected profits far too speculative to provide the basis for relief in this case. We do, however, believe that this is an appropriate cause for relief in the form of a requirement that GP purchase plaintiffs' stock at a fair price. See *Baker v. Commercial Body Builders, supra* (264 Or at 633). That price should be determined as of June 20, 1975, the date when we have found that the entire management of the venture was taken over by GP. The case must be remanded to the trial court for further proceedings to determine MPI's value on that date, taking into account the adjustments made necessary by our holding in this opinion that GP has charged MPI with excessive interest.

GP contends that the Montana group is not entitled to any relief because it has come into equity with unclean hands. We do not agree.

There was evidence that some of the materials used in the construction of the Roundup mill were purchased from suppliers in which the Montana group members held undisclosed interests. The trial court found that the transactions were fair to MPI. There was no showing of a fraudulent intent on the part of the Montana group or of any damage to MPI as a result of these transactions. Although these conflicts of interest should have been disclosed, the circumstances do not require that plaintiffs be denied the assistance of a court of equity. Allowing equitable relief here is not permitting plaintiffs to either profit by, or to extricate themselves from the consequences of, their own wrongdoing. Compare *Bergquist v. International Realty,* 272 Or 416, 432-433, 537 P2d 553 (1975); *Martin v. Tikka,* 263 Or 350, 500 P2d 1209 (1972); *Merimac Co. v. Portland Timber,* 259 Or 573, 488 P2d 465 (1971); *Oliphant v. French,* 256 Or 341, 472 P2d 275 (1970). See, generally, Fadeley, *The Clean-Hands Doctrine in Oregon,* 37 Or L Rev 160 (1958).

Except as indicated in this opinion, the decree of the trial court is affirmed. Remanded for further proceedings in accord with this opinion.