Argued February 23, affirmed as modified
and remanded with instructions October 1
appellant's and respondent's reconsiderations
denied November 15, 1979 appellant's and respondent's
petitions for review denied January 29, 1980 (288 Or 519)

## DELANEY, et al,
### *Respondents-Cross-Appellants,*
#### *v.*
## GEORGIA-PACIFIC CORPORATION, et al,
### *Appellants-Cross-Respondents.*

### (MCC No. 422-128, CA No. 11093)

601 P2d 475

[Content redacted]

[440]

[440-a]

Norman J. Wiener, Portland, argued the cause for appellants - cross-respondents. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, Peter C. Richter and James N. Westwood, Portland.

Barnes H. Ellis, Portland, argued the cause for respondents - cross-appellants. With him on the briefs was Karen K. Creason, Portland.

Before Schwab, Chief Judge, and Thornton, Lee and Gillette, Judges.

GILLETTE, J.

## GILLETTE, J.

This case is on appeal for the second time. In its opinion in the first appeal, *Delaney v. Georgia-Pacific Corp.,* 278 Or 305, 307-309, 564 P2d 277 (1977), the Supreme Court described the factual background as follows:

"Montana Pacific International (MPI) is a corporation formed to carry out a joint venture. One half of its stock was subscribed to by Montana Lumber Sales (MLS) and the other half by Georgia-Pacific Corporation (GP).[1] MLS is a closely-held Montana corporation, owned in part and controlled by plaintiffs Donald Delaney and Robert Delaney. The Delaneys, MLS, its associated companies, and certain key MLS employees are referred to in the record as the 'Montana group,' and we will adopt that usage for convenience.

"The Montana group, prior to 1974, had experience and prospects for timber acquisition in Montana and Canada, but was heavily in debt and needed capital. GP had money, access to financing, and an extensive wood product marketing network. On February 6, 1974, MLS and GP executed a 'Joint Venture Agreement' creating a joint venture to be known as Montana Pacific International. The venture was for an indefinite term; its purpose was stated to be:

"'* * * [A]cquiring Assets, conducting the business of managing and harvesting forest growth, manufacturing, buying, selling, and generally trading and dealing in timber, logs, lumber, and wood products other than plywood, pulp and paper * * *'

The agreement also provided that each party's interest would be 50 per cent. They were to share equally in overall management responsibility, but the Montana group was to have 'operating responsibility for the management of all Assets of Joint Venture,

[1] The formal parties to the joint venture are Rocky Mountain Timber Corporation, a wholly-owned susidiary of MLS and O.P.M. Co., Inc., a wholly-owned subsidiary of GP. No one contends that the interposition of these subsidiary corporations has any significance for purposes of this case. We will, therefore, treat MLS and GP as the joint venturers in name as well as in fact.

[441]

including, but not limited to the types of products to be manufactured and supervision of the day to day operations.' Each party's capital contribution was to be $1.5 million. GP agreed to use its best efforts to obtain additional financing and both parties agreed to guarantee the venture's debts.

"Some time in the spring of 1974 the Montana group learned that a 'timber package' they had sold in 1973 to Louisiana Pacific Corporation (LP) might be available by purchase or assignment. This 'package' consisted of cutting rights to Montana timber which was under diverse ownership. The Montana group had negotiated contracts with the individual owners and had then transferred the cutting rights to LP which agreed to cut 45 million board feet per year and to pay MLS $18 per thousand board feet. Robert Delaney, learning that LP might be willing to reconvey the package, or a portion of it, to MLS, informed GP that this was a possible business opportunity for the joint venture. GP agreed that the possibility should be followed up.

"After a period of complex negotiations, MPI and LP executed, on June 24, 1974, a 'Timber Cutting Contract' conveying to MPI the timber remaining uncut by LP. MPI agreed to pay LP $40 per thousand board feet for the merchantable timber covered by the contract. At the same time MPI purchased from LP an existing sawmill near Roundup, Montana, and the site for a potential mill at Lewistown, Montana. It was contemplated by the joint venturers that MPI would reconstruct or replace the Roundup mill and would construct a new mill at Lewistown in order to process the timber as it was cut.

"In the meantime they had also determined to incorporate MPI. The incorporation and the LP transaction were consummated at the same time. The contract with LP was, therefore, executed by MPI, a Montana corporation. The corporation was required to make cash payments totaling $7,350,000 to LP at closing: $650,000 for the Roundup and Lewistown mill sites, and $6.7 million as a 'deposit' to be applied, at the rate of $20 per thousand board feet, to the price of the first 335 million board feet cut by MPI. This cash payment was made by the parties' capital

contributions to the joint venture corporation and by obtaining a loan from the Bank of America in the amount of $4.5 million, payable in six months.[2]

"MPI then proceeded with construction of the new mill at Roundup. The Montana group undertook on-site responsibility for the mill's design and construction, and also acquired additional timber cutting rights for MPI. The mill was substantially completed by March 1975 at a total cost of approximately $4.35 million. Construction and operating costs during this period were met by advances from GP to MPI.

"Also during this period, however, conflicts developed between the parties about control of the mill, the handling of the venture's financing, and the details of management. The discord became critical by May of 1975 and the parties have, since that time, been unable to agree upon the proper conduct of the venture. The venture has not been a financial success. The Roundup mill has always operated at a loss; the Lewistown mill has not been constructed. MPI is heavily in debt to GP, the timber contracts purchased from LP are approaching expiration, and the entire future of MPI is highly doubtful.

"This suit was filed in October 1975. Plaintiffs, suing both individually and derivatively on behalf of MPI, have charged GP with breaches of its fiduciary duties as a joint venturer. GP denied any liability for the alleged breaches, and counterclaimed for $703,000, plus interest on notes representing loans to MLS."

[2] MPI was incorporated with a capital of $3 million. GP contributed its $1.5 million in cash. MLS borrowed $675,000 from GP, and the balance of its contribution from a third party. To secure the loan from GP, MLS pledged to GP its shares in MPI."

At the first trial, the trial court denied relief to the Montana group and gave GP judgment for $703,000 on its counterclaim. The Supreme Court affirmed the judgment for GP, but reversed the trial court's disposition of the Montana group's claims and directed that the Montana group be afforded relief on remand for three specific injuries.

First, the Supreme Court found that GP had charged interest to MPI in excess of agreed upon rates

on GP's cash advances to the joint venture. The trial court was instructed to determine certain relevant dates in connection with the interest overcharges and to enter judgment for MPI accordingly. Prior to the second trial, the parties agreed that the damages attributable to the interest overcharges equaled $129,214.

Second, the Supreme Court found that, as a condition of agreeing to the 1974 conveyance of the timber package from Louisiana Pacific to MPI, GP had required that the Montana group transfer certain timber on its "Schanbacher Ranch" stand to Louisiana Pacific under the terms of the *1973* conveyance, with the effect that that timber would be included in the *1974* conveyance from Louisiana Pacific to MPI. GP gave no explanation to its joint venturer for this requirement. However, GP's apparent motive was to assure that the total amount of timber in the Louisiana Pacific package—which had not originally included the Schanbacher Ranch timber—would exceed 335 million board feet, the minimum volume necessary to guarantee MPI's full recovery from Louisiana Pacific of the $6.7 million deposit. GP had negotiated the 1974 agreement with Louisiana Pacific on behalf of MPI. The contractual language obfuscated—and GP did not disclose to the Montana group—the fact that Louisiana Pacific was not required to refund the deposit if less than 335 million board feet were cut.

Against that background, without knowledge of GP's actions but wanting to consummate the agreement between MPI and Louisiana Pacific, the Montana group agreed "under protest" to convey the Schanbacher Ranch timber to Louisiana Pacific. *See* 278 Or at 317-318. Hence, the Montana group conveyed timber to Louisiana Pacific at $18 per thousand board feet (the price under the 1973 Montana group sale to Louisiana Pacific), which Louisiana Pacific would then sell to MPI at $40 per thousand board feet (the contract price for Louisiana Pacific's 1974 conveyance to MPI). The Supreme Court directed the trial

court to determine the volume of timber on the Schanbacher Ranch and to award the Montana group damages against GP equal to that volume multiplied by the $22 difference in price per thousand board feet. On remand, the trial court determined that the volume was 21 million board feet and awarded the Montana group damages of $462,000.[1]

Third, the Supreme Court found that, on June 20, 1975, GP improperly expelled the Montana group from the management of MPI. It directed the trial court to ascertain the value of the Montana group's 50 percent interest in MPI as of that date, and to require GP to purchase the Montana group's shares for an amount equal to that value, taking into account "the adjustments made necessary by our holding * * * that GP has charged MPI with excessive interest." 278 Or at 325. On remand, the trial court found the value of the Montana group's 50 percent interest in MPI to be $2,350,000.[2]

In addition to the foregoing, the Supreme Court held that GP has perpetrated several other breaches of contract and of its fiduciary duty to the Montana group. The other breaches, however, were not found to be causative of measurable damages.

GP appeals from the portions of the second trial court's decree relating to the Schanbacher Ranch timber and to the value of the Montana group's interest in MPI. The Montana group cross-appeals on

[1] As of the relevant dates, the timber had not been harvested. Consequently, GP argues that any award of damages to the Montana group is premature, and that the court should retain jurisdiction to award such damages as they accrue. In addition to being contrary to the Supreme Court's directive on remand, this argument misses the point. As a result of the contracts among the Montana group, Louisiana Pacific Corporation and MPI, it is already settled that the Montana group has been irrevocably deprived of its Schanbacher Ranch timber. The damage has accrued, and the measure of damages has been established by the Supreme Court.

[2] We are unable to determine from either the trial judge's letter opinion or the evidence at trial precisely how the $2,350,000 figure was established. As our discussion, *post,* indicates, we conclude that the appropriate amount is somewhat less than $2,350,000.

several theories which we will describe in conjunction with our disposition of them.

## DAMAGES FOR SCHANBACHER RANCH TIMBER

In the spring of 1974, at the time MPI was considering the repurchase of the Louisiana Pacific "timber package," MPI conducted a cruise of the area and of the Schanbacher Ranch. GP and Montana group personnel planned and conducted the cruise of the area jointly, but the Schanbacher Ranch portion was cruised only by GP employes. The 1974 cruise revealed that the total area contained at least 335 million board feet of timber, *including* 21 million board feet on the Schanbacher Ranch.

In 1977, after the Supreme Court had remanded the case to the trial court to determine the volume of timber and to use that volume as one of the factors in assessing GP's liability to the Montana group, GP suggested that there be a second cruise. The Montana group chose to rely on the 1974 cruise and rejected GP's suggestion. Thereafter, GP decided to conduct its own independent cruise of the Schanbacher Ranch. The techniques of GP's 1977 cruise differed from the 1974 cruise in a variety of respects: The number of "sample plots" was increased; a different measurement methodology was used; a substantial cull factor (*i.e.,* reduction for non-merchantability) was introduced; and "fringe areas" which had been included in the 1974 cruise were excluded. These 1977 changes were conducive to a finding of less volume than the 1974 cruise had determined to be present. GP's 1977 cruise disclosed a timber volume of 5.1 million board feet—approximately one quarter the volume shown by the 1974 cruise.

Various witnesses were called by the parties to testify about the comparative reliability of the two cruises. To some extent, that testimony dealt with the preferabilty of the methodology and techniques used on the respective cruises and, in that respect, was a

battle of opinions. A considerable amount of testimony and argument also dealt with the comparative familiarity of the witnesses with the area of the Schanbacher Ranch and the quality of timber coming from it. The testimony and other evidence also showed the following:

1. GP's principal witness at the second trial was a GP employe who had been the main participant in both cruises for GP. At the second trial, he strongly endorsed the reliability of the 1977 cruise and disparaged that of the 1974 cruise. But in his reports to GP following the 1974 cruise, and in a 1976 deposition (taken before the Supreme Court remanded the matter to the trial court to determine the timber volume and to use that volume as part of the calculus of damages against GP), the employe had vouched for the reliability of the 1974 cruise.

2. The then chief executive officer of GP had insisted on a careful and accurate cruise in 1974, aimed at assuring that the entire Louisiana Pacific package, together with the Schanbacher Ranch, contained at least 335 million board feet. The evidence is convincing that, at least from GP's standpoint, the decision for MPI to enter into the 1974 contract with Louisiana Pacific was contingent upon at least that volume of timber being present.

3. Between 1974 and 1977, upper echelon GP executives variously represented to prospective customers and others that the total volume of timber GP had acquired through its Montana operations was between 400 and 600 million board feet. If these representations were accurate, it would follow that Louisiana Pacific's package contained at least the 335 million board feet shown by the 1974 cruise.[3] At the second trial, a GP executive who had represented to a

[3] The record is not entirely clear on the point, but it appears that the maximum amount of timber cutting rights MPI acquired in the area from sources other than the Louisiana Pacific package and the Schanbacher Ranch was 125 million board feet.

[447]

potential customer that the area contained 500 to 600 million board feet denied on cross-examination that that representation was true when made. However, in the context of the second trial, where GP was attempting to prove that the volume of timber was small, a question of credibility was involved and the trial court could well find—as this court does—that the GP executive was not candid in denying the accuracy of his own representation.

Even ignoring the inconsistencies in the actions and testimony of GP and its witnesses, there is ample reason to distrust the 1977 cruise. It was conducted by GP for the sole purpose of redetermining a timber volume which had already been determined,[4] after the Supreme Court's decision made it very much in GP's interest to assert that the timber volume was small. GP's 1977 changes in cruising methodology from those used in 1974 had the obvious effect—if not the purpose—of reducing the amount of timber which the second cruise would show. As noted, GP's witnesses testified generally that the methodology and conduct of the 1977 cruise were preferable to those of the 1974 cruise, and the Montana group's witnesses testified generally to the contrary. However, there was evidence that the methodology of the 1974 cruise is in accord with the current cruising practices *generally* used by GP, and in complete conformity with the kind of cruise GP itself *wished* to have performed in 1974.

We conclude that the 1974 cruise results are entitled to considerably more weight than the 1977 results. We therefore find, as the trial judge did, that the volume of timber on the Schanbacher Ranch was 21 million board feet.

■ GP makes several secondary arguments regarding the Schanbacher Ranch timber volume issue. First, GP suggests that, in light of the Montana group's rejection of GP's offer to participate in a new cruise after the

---

[4] There had been no significant harvesting or other events to reduce the timber volume between the 1974 and 1977 cruises.

Supreme Court's 1977 opinion, we should remand and instruct the trial court to order another cruise by an independent expert mutually acceptable to the parties or appointed by the court. GP's suggestion is a procedural enigma. The Montana group had the burden of proof as to the timber volume and met its burden of proof through evidence of the 1974 cruise results and supporting evidence. The trial court and this court have found the Montana group's evidence persuasive. Whether we were or were not persuaded, however, both sides have put on their proof and the trial is over. There is no conceivable reason for taking further evidence now.

■ GP next contends that the trial court erred in adding interest to the damages for the Schanbacher Ranch timber. GP's point is that no timber has yet been harvested, no damages have yet accrued, and, consequently, no interest can attach. We reject GP's contention, for reasons essentially identical to those detailed in n 1, *supra.*

■ Finally, GP contends that the judgment for the Schanbacher Ranch timber which, in accordance with the Supreme Court's directive, runs in favor of Mid State Development Corporation (the Montana group entity which owned the timber), should be offset against GP's $703,000 judgment on its counterclaim against two other Montana group plaintiffs. We disagree. There is no mutuality of parties justifying the offset.

## VALUATION OF MONTANA GROUP'S INTEREST IN MPI

The trial court found that the value of the Montana group's 50 percent interest in MPI as of June 20, 1975 was $2,350,000. GP appeals from that finding and the judgment based on it.

■ ■ GP argues that the Montana group was required to prove the "market value" of its shares in MPI or be limited to a minimal recovery based on book value. We

disagree. The Supreme Court did not speak of market value, but instead used such terms as "appropriate value" and "fair price," 278 Or at 325, in describing the amount GP was to pay the Montana group for the latter's half-interest in MPI. However, while the Supreme Court did not *limit* the Montana group to proof of market value as the measure of damages, it also did not *prohibit* the Montana group from proving damages on the basis of market value. The Montana group's proof of the value of its interest in MPI consisted of two alternative approaches. One approach was presented through the expert testimony of Michael Romine, and will be discussed below. The principal factor in the Montana group's other approach was GP's September 8, 1975, offer to buy the Montana group's share in MPI for $1,950,000.[5] The GP offer, if probative of anything, is probative of the market value of one-half of MPI; the offer reflected what one buyer was willing to pay for that interest in MPI on a date reasonably proximate to the valuation date designated by the Supreme Court. Moreover, as the Montana group points out, the GP offer was good evidence of market value because the market for shares in closely held corporations often consists primarily of existing shareholders. For reasons to be discussed, we consider the GP offer to be satisfactory evidence of the value of the Montana group's interest in MPI.

GP contends that its offer was intended solely to "buy peace" after irreconcilable differences between GP and the Montana group developed and, as such, it was a compromise offer and evidence of it was inadmissible. GP acknowledges, however, that whether an offer is intended as a compromise is a question of fact. Here, there is no persuasive evidence to suggest that GP's offer was so intended. GP's letter communicating

---

[5] The offer was made pursuant to a so-called "Russian Roulette" buy-sell agreement between the parties. That agreement provided that, at any time, either party to the joint venture could offer to buy the shares of the second at a price stated by the offeror. The second then had the option of selling its shares to the offeror at that price or purchasing the offeror's shares for the same amount.

the offer does not refer to the settlement of any claims or the resolution of any disputes between the parties. The offer was made September 8, 1975. This suit was initiated in October, 1975. The chief executive officer of GP at the time the offer was made testified that GP wished to acquire the Montana group's interest in MPI to get control of the company and, freed of the obligation to consult with the Montana group about management, minimize losses and recover some of the money GP had invested in or advanced to MPI. While there is evidence that relations between GP and the Montana group were quite acrimonious and that GP wanted to be rid of its joint venturer, nothing in the record suggests that GP's purposes in making the offer did not include gaining sole ownership of MPI. Indeed, GP acknowledges that one of its objectives was to make the offer price sufficiently high to prevent the Montana group from opting to purchase GP's shares under the buy-sell agreement. *See* n 4, *supra.* We agree with the trial court that GP's September 8, 1975, offer was not intended as a compromise or settlement, and that it was admissible.

■ GP next argues that the offer is not probative of the value of the Montana group's interest as of June 20, 1975. GP makes three points in support of that argument. First, GP contends that the offer was not evidence of fair market value, because the amount of the offer "reflected the value of the enterprise *to G-P,"* (emphasis GP's) and that GP was an "unwilling buyer faced with the necessity of salvaging the huge unsecured loans to MPI and of cutting further losses * * *" by acquiring complete ownership of MPI. As noted earlier, the Montana group was not required to confine its proof or the trial court its inquiry to the *market* value of the MPI shares. But even if GP were correct in contending that market value was the sole available method of proof, its point does not succeed in demonstrating that the offer was not relevant to market value. No peculiar reasons GP may have had for desiring to obtain the Montana group's shares made

GP an unwilling buyer, at least for purposes of establishing the relevancy of GP's offer to market value.

GP's second point is that its offer was not evidence of value because GP had a special incentive to make its offering price unduly high to prevent the Montana group from purchasing GP's interest in MPI under the buy-sell agreement. The response to this point is essentially the same as the response to the first. The motive of a *willing* buyer in determining the amount of its offer has no relevance to market value. The fact of the offer speaks for itself.

GP's final point is that drastic changes in circumstances between June 20, 1975 and September 8, 1975—consisting, first, of the Montana group's inability to obtain financing and, second, of mounting operating losses during the interim—made the September 8 offer unindicative of value on June 20. Any negative change in MPI's circumstances between June 20 and September 8 does not mean that the September 8 offer was *irrelevant* to value as of June 20; if anything, it means instead that the value of the Montana group's interest on the earlier date was probably greater than the value of that interest on the date of the offer.

We conclude that the $1,950,000 offer by GP to the Montana group for the latter's shares in MPI is probative of the value of the Montana group's interest. The Montana group argues that the amount of the GP offer must be supplemented by other items to arrive at a total value, because those items were not taken into account by GP in determining its offer price. With one exception, discussed below, we do not agree with that argument. While it seems clear that GP's offer was not based on a valuation of all the assets and liabilities of MPI, the offer price was nevertheless the amount GP was willing to pay for the Montana group's interest. As such, the offer was evidence of market value, regardless of the basis of its calculation. The Montana group cannot simultaneously rely on the offer and

hypothesize that GP would or should have been willing to pay more if various factors had entered into its calculations. As we noted above, the offer speaks for itself.

As an alternative to its proof of value through the $1,950,000 GP offer, supplemented by other items, the Montana group presented the expert testimony of Michael Romine, whose essential approach was to place a value on the enterprise *to a hypothetical* investor on the basis of projected returns and costs. He concluded that the June 20, 1975, value of one-half of MPI was not less than $3.6 million. Mr. Romine's valuation testimony itself was impressive. However, we are unable to accept the assumptions underlying his testimony. The evidence is not supportive of the likely existence or occurrence of the conditions on which that testimony necessarily depends: that a purchaser of MPI could rid itself of GP as a joint venturer through the buy-sell agreement, retire existing debt, *and* obtain and carry the financing necessary to construct a second sawmill and otherwise bring MPI to the point of optimal operations essential to Mr. Romine's opinion of value.

The testimony of GP's witnesses was, essentially, that the debt and the profit and loss posture of MPI was such that its value to an investor would be zero. The GP witnesses hypothesized that the debt, asset, and current operations posture of MPI would have been viewed by a potential investor as irreversibly incompatible with improved future operations and profits. We reject their conclusion for the reason, *inter alia,* that a zero value is contradicted by the fact that GP itself offered the Montana group $1,950,000 for the latter's shares.

■ We conclude that the most persuasive evidence of MPI's value on June 20, 1975, was the $1,950,000 GP offer. In keeping with the Supreme Court's opinion, that value is to be adjusted in light of GP's interest overcharge to the joint venture. As earlier noted, the

parties have agreed that the amount of the interest overcharge is $129,214. GP contends that, having already agreed to pay that amount as damages for the interest overcharge itself, the inclusion of part of the amount in the value of the Montana group's interest GP must purchase is impermissible. We disagree. The Supreme Court opinion contemplates that the interest overcharge should be reflected in the value of MPI on June 20, 1975, and be taken into account in the value of the shares of MPI which GP is required to purchase. One-half of the interest figure—$64,607—must be included in the price GP is to pay the Montana group. The total value of the Montana group's interest on June 20, 1975, was therefore $2,014,607, and the trial court's finding of a $2,350,000 value is modified accordingly.

## MONTANA GROUP'S CROSS APPEAL

In its cross-appeal the Montana group seeks six modifications to the decree.

■ 1. The decree of the trial court provides that the $462,000 judgment for Mid State Development Corporation 'for damages arising out of the June 11, 1974 contract for sale of timber on the Schanbacher Ranch' is to bear interest from June 20, 1975, until paid. The Montana group contends that interest should run from June 11, 1974—the date of the "misappropriation" of the timber, rather than June 20, 1975—the date of the Montana group's expulsion from the management of MPI. We agree. Because the trial court considered prejudgment interest to be appropriate, as do we, the interest should run from the date of the injury in question rather than from a later date when a subsequent unrelated injury occurred. *Cf. Gresham State Bank v. O and K Con. Co.,* 231 Or 106, 129, 370 P2d 726, 372 P2d 187 (1961). Paragraph (1) of the decree should be modified to provide that the six percent interest on the $462,000 judgment should run from June 11, 1974, until paid, rather than from June 20, 1975.

2. The Montana group next argues that the $703,000 judgment for GP in the first trial, which was affirmed by the Supreme Court, and the judgment on remand for the Montana group for its one-half interest in MPI, are required by Oregon statutes to be consolidated into a single judgment, with GP's smaller judgment offset against the judgment in favor of the Montana group. As best we can discern, the objective of the Montana group in making this contention is to forestall enforcement proceedings by GP in connection with its $703,000 judgment, and to eliminate interest which has accrued on that judgment between the two trials.

Specifically, the Montana group argues that ORS 18.125(1) prohibits the entry of a judgment disposing of fewer than all the issues in a case, except under conditions not present here; that ORS 19.190 requires that, after an appeal, a new judgment or decree is to be entered in the trial court incorporating the mandate of the appellate court; and that ORS 18.100 and ORS 18.080(2) require that, where there are counterclaims, a party recovering damages which exceed the damages recovered by the other is entitled to a single judgment for the excess. The Montana group contends that these statutes, independently or in combination, require that a consolidated judgment incorporating and superseding the judgment in the first trial be entered after a case which has been remanded in part by an appellate court is retried. We conclude that the statutes do not have that effect. ORS 18.125(1) relates to the disposition of issues in a single trial. ORS 18.080(2) provides for judgment for a plaintiff in the amount by which his admitted claims exceed the counterclaims of the defendant. ORS 18.100 provides that a defendant shall have judgment equal to the excess of his counterclaims over the plaintiff's damages established "at *the* trial." (Emphasis supplied.) ORS 19.190 has the principal purpose of providing mechanics for the reflection of appellate court decisions in the records of the trial court. We do not

understand the cited statutes as imposing a "single judgment" rule in cases, like this, where part of a judgment or decree is affirmed and part reversed and remanded for retrial.

■ 3. The Montana group's third contention is related to its second. It argues that the $703,000 GP judgment should be offset against the Montana group judgment for its half interest in MPI as of June 20, 1975, or, at the latest, as of April 26, 1976—the date of the judgment in the first trial. The Montana group's objective is to eliminate disparities in both the rate and time of accrual of interest on the two judgments. We concluded above that the statutory mechanism for entry of judgments does not require that the judgment for GP in the first trial be automatically consolidated with the judgment for the Montana group in the second, with a resulting automatic offset. It is nevertheless clear that, under certain circumstances, judgments can be offset against one another. *See* 40 CJS, Judgments, §§ 566 *et seq.; cf. Hartford Accident v. Pyle,* 271 Or 97, 530 P2d 843 (1975). The principal authorities cited by the Montana group in support of its contention are *Smith v. Turner,* 33 Or 379, 54 P 166 (1898), and the United State Court of Appeals' decision in *Hunt Foods v. Phillips,* 248 F2d 23 (9th Cir 1957) in which *Smith* is cited. In both *Smith* and *Hunt Foods,* setoffs of judgments were disallowed. However, in *Hunt Foods,* the court hypothesized a situation where a setoff would be appropriate, to-wit, where there is a claim for the contract price of goods sold and a counterclaim for breach of contract based on defects in those goods. The Montana group argues that the present facts are analogous to that hypothetical case, because the $703,000 judgment for GP is based on notes evidencing the loan GP made to the Montana group to acquire stock, GP's "conversion" of which is the basis for the $2,014,607 judgment against it. Thus, according to the Montana group, GP's judgment is essentially the same as a seller's judgment for the price of goods which the seller later suffers judgment for wrongly appropriating.

[456]

■ The Montana group's argument is not convincing. GP did not convert or misappropriate the stock. The wrongful act by GP was the June 20, 1975, ouster of the Montana group from corporate management. That action had no immediate impact on the integrity of the Montana group's equity in the corporation. The requirement that GP purchase the Montana group's shares is an equitable remedy for the improper conduct of GP; however, the conduct itself did not directly affect the shares and had no other direct nexus to the loan for which GP recovered judgment at the first trial.

■ 4. The Montana group next contends that the interest on the judgment in its favor should exceed the statutory six percent rate provided by ORS 82.010(1)(b). The thrust of this contention is that the Montana group incurred substantial financing costs while GP withheld payment of the principal amounts owed and that, in addition, GP obtained a substantial windfall because of its use of those amounts and because of the interest rate of 9.05 percent awarded it on its $703,000 judgment. Consequently, the statutory interest rate does not compensate the Montana group nor penalize GP for these respective unwarranted gains and losses in connection with interest and financing costs. The Montana group concludes that, under Oregon case law, a court of equity has the authority and duty to rectify its undeserved losses and GP's undeserved gains by establishing an appropriate rate of interest on the judgment.

In our view, an augmented rate of interest on the judgment would not be appropriate here. The Montana group has been awarded prejudgment interest pursuant to the trial court's and ·this court's holdings. There is no inequity in the $703,000 judgment for GP bearing a higher rate of interest than the statutory rate. GP's recovery was based on promissory notes, and the trial court's judgment in the first trial provided that GP was to recover the $703,000 value of the notes "plus accrued interest at the specified rates set forth"

in the notes. ORS 82.010(1)(b) provides that interest on judgments shall be six percent from the date of entry, except in the case of judgments and decrees

"* * * upon contracts bearing more than six percent interest and not exceeding the maximum rate, [which shall] bear the same rate of interest as borne by such contracts."[6]

■ 5. The Montana group's next contention on its cross-appeal is that it should have been allowed costs and disbursements for the first as well as the second trial and that among the allowable disbursements were those for depositions. The trial judge allowed costs only for the Montana group's disbursements in connection with the second trial, exclusive of depositions and of a certified copy of the testimony in a different case of one of GP's expert witnesses. We agree with the Montana group that its costs and disbursements in the first as well as the second trial are recoverable. *City of Seaside v. Oregon S. & C. Co.,* 87 Or 624, 635-36, 171 P 396 (1918). However, we agree with the trial court in its disallowance of the Montana group's disbursements for depositions in either trial. *Kendall v. Curl, et al,* 222 Or 329, 353 P2d 227 (1960). We therefore hold that paragraph (5) of the decree should be modified by adding to the trial costs and disbursements allowed by the trial court an additional $863.63, thereby increasing the total costs and disbursements allowed for the trial proceedings from $276.80 to $1,140.43.

■ 6. The Montana group's final contention is that it should be allowed attorney's fees. Its theory is that the suit was brought partially on behalf of the Montana group and partially as a derivative suit on behalf of MPI, and that attorney's fees are recoverable in derivative suits. *Krause v. Mason,* 272 Or 351, 537 P2d 105 (1975). The Supreme Court denied attorney's fees

---

[6] ORS 82.010 was amended by Oregon Laws 1979, ch 794, § 1, to provide for statutory interest of nine per cent. The statute was also amended in other respects. Although the amendments are now in effect, they are not relevant to the judgments in this case, and the references here are to the statute prior to the 1979 amendments.

to the Montana group in the previous appeal. The Montana group explains that the Supreme Court did so "solely because it had no convenient basis on which to make an allocation of legal services among" the Montana group plaintiffs and MPI. However, the Montana group argues that at this stage of the proceedings there is an identifiable percentage of the total amount of damages awarded to MPI and to the Montana group plaintiffs, respectively, and that the percentage of plaintiffs' total attorney's fees which corresponds to MPI's share of the total damages should be recoverable. We disagree. Assuming arguendo the correctness of the Montana group's explanation of the Supreme Court's denial of attorney's fees, we are nevertheless convinced that the comparative recovery of damages by MPI and the Montana group provides no basis for either awarding attorney's fees on the derivative suit theory or ascertaining the proportion of the fees attributable to the derivative suit. There is no necessary correlation between the respective dollar recoveries of MPI and the Montana group and the comparative value of legal services provided them. As the plaintiffs acknowledge, there was a "unitary legal and factual development of the case * * * ." The intended principal beneficiary of that development was the Montana group. Under these circumstances, the trial court properly declined to allow attorney's fees.

The decree of the trial court is affirmed as modified and remanded for amendment in accordance with this opinion.