Argued and submitted January 3, 2013, affirmed in part and reversed
and remanded in part May 14, petition for review allowed
November 20, 2014 (356 Or 516)

Gerald L. ROWLETT,
an individual;
Westlake Development Company, Inc.,
an Oregon corporation;
and Westlake Development Group, LLC,
an Oregon limited liability company,
*Plaintiffs-Appellants,*

*v.*

David G. FAGAN,
an Oregon resident;
James M. Finn, an Oregon resident;
and Schwabe Williamson & Wyatt, PC,
an Oregon professional corporation,
*Defendants-Respondents.*

Multnomah County Circuit Court
090101006; A146351

327 P3d 1

David W. Melville argued the cause for appellants. With him on the briefs were The Law Offices of David Melville, and Katherine R. Heekin and The Heekin Law Firm.

Chris Carson argued the cause for respondents. On the brief were Graham M. Sweitzer, Stephen C. Voorhees, and Kilmer Voorhees & Laurick, P.C.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

Armstrong, P. J., concurring.

## NAKAMOTO, J.

Plaintiffs Rowlett and his two companies, plaintiffs Westlake Development Company, Inc. and Westlake Development Group, LLC, appeal in this attorney malpractice action against their former attorneys, defendants Schwabe Williamson & Wyatt, PC (Schwabe) and lawyers Fagan and Finn. Some, but not all, of plaintiffs' theories of defendants' negligence went to trial, as did plaintiffs' claims for negligent misrepresentation and breach of fiduciary duty. There was a defense verdict on the latter two claims, which plaintiffs do not challenge on appeal. As for the negligence claim, plaintiffs achieved a Pyrrhic victory: the jury agreed that defendants were "negligent" in representing plaintiffs but awarded no damages. Asserting seven assignments of error, plaintiffs now challenge various pretrial and trial rulings by the trial court, with all but one in some way concerning their damages on the negligence claim.

Plaintiffs challenge the trial court's pretrial dismissal of two aspects of their damages by way of summary judgment. They contend that they were entitled to seek as damages on the negligence claim (1) the attorney fees that they had paid to Schwabe for the legal services defendants rendered in the underlying matter, litigation involving Sunrise Partners LLC (Sunrise), and (2) the attorney fees that they would have recovered from the Sunrise opponents, as measured by their fees incurred in this action. We reject the first contention and, in light of our disposition and the opportunity for plaintiffs to seek fees as part of their damages on remand, we do not reach the second contention.

Plaintiffs also argue that the jury's determination of damages was adversely affected because of the trial court's erroneous rulings at trial. Specifically, plaintiffs contend that (1) over their objection, the trial court gave the jury a verdict form that allowed it to use an impermissible date for valuing Rowlett's interest in Sunrise; (2) despite a ruling in plaintiffs' favor on their motion *in limine*, the trial court failed to limit defendants' use of evidence of the Sunrise litigation settlement during the trial; and (3) over plaintiffs' objection, the trial court erroneously allowed testimony by defendants' expert witness, accountant Thompson, as to the

value of Rowlett's interest in Sunrise. We agree with plaintiffs that the trial court erred regarding the verdict form.

Plaintiffs also assign error to the pretrial dismissal of one of their specifications of negligence based on defendants' motion under ORCP 21 G(3). Plaintiffs alleged that defendants damaged them in the Sunrise litigation by failing to timely allege an "oppression" or "squeeze-out" claim, coupled with a demand for a forced buyout or dissolution of Sunrise. The trial court concluded that plaintiffs had failed to establish that a limited liability company (LLC) member can bring an oppression claim and granted defendants' motion to dismiss that part of the negligence claim. We reverse because plaintiffs properly stated a claim for negligence by alleging that defendants breached a duty of care by asserting the oppression claim too late in the Sunrise litigation and that plaintiffs suffered harm because of that breach.

## I. BACKGROUND

To set the stage for our discussion of the assignments of error, where we consider additional facts relevant to each of those assignments, we provide background concerning the formation of Sunrise and who its members and managers were, the history of defendants' representation of plaintiffs, and the procedural history of this malpractice action. We state the facts regarding defendants' breach of their duty of care in the light most favorable to plaintiffs, "the party in whose favor the verdict was returned." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 490, 982 P2d 1117 (1999).

### A. *The formation of Sunrise*

Rowlett is a real estate developer and residential building contractor and the sole principal in his two companies. Before forming Sunrise, Rowlett held an option to purchase land in Gresham, the so-called Kelley Creek property. Rowlett also had plans to obtain options to purchase three properties in Happy Valley, which the parties referred to as the Sunnyside Road properties. All told, the parcels together were worth $11,000,000. Rowlett was looking for other investors to help purchase and develop the properties and decided to form Sunrise with Michael Pruett and

Tracey Baron in the fall of 2000. Baron agreed to provide financing for the two projects through Sunrise.

Sunrise was organized as an Oregon manager-managed LLC. The Sunrise operating agreement provided that Sunrise could have only three Class A members, and Rowlett, Pruett, and Baron held all of the Class A shares. Class A ownership could not be diluted, even if one of the members declined to contribute to a request for capital contributions. The operating agreement further allowed Sunrise to have Class B members. Each Class A member held an effective veto over the admission of a Class B member. In addition to being a Class A member, Rowlett was a Class B member. Initially, all three men were managers of Sunrise.

After Sunrise was formed, Rowlett assigned his rights to purchase the Kelley Creek property to Sunrise and, in 2001, acquired options to purchase the Sunnyside Road properties, which he also assigned to Sunrise. Rowlett's companies had made payments on the option contracts.

Sunrise struggled to find other investors. It stopped making payments on the Kelley Creek option contract and lost the option to purchase that property; Sunrise also defaulted on a purchase agreement for one of the Sunnyside Road properties. Baron, an investment advisor at Private Consulting Group, Inc. (PCG), approached Robert Keys, his employer at PCG, about investing in Sunrise and becoming a member. Rowlett opposed having Keys join Sunrise.

But after a vacation in March 2002, Rowlett learned that, without his approval, Pruett, Baron, and Keys were planning to take Sunrise's rights with respect to the Sunnyside Road properties to a different entity that would not include Rowlett. Baron excluded Rowlett from a meeting with a potential construction partner, Randy Robinson, who later became a member in Sunrise. Rowlett learned that others who worked for PCG besides Keys were becoming involved in Sunrise, also without Rowlett's approval. Rowlett refused to sign an amended operating agreement and, without his consent, Keys became a Sunrise Class B member through a consent resolution that purported to contain Rowlett's signature, which Rowlett contended was a forgery.

B. *Schwabe's representation of plaintiffs*

In June 2002, Rowlett, concerned about the actions that Pruett and Baron had taken in Sunrise, went to Schwabe for representation. Schwabe assigned the matter to Fagan, an associate with three to four years of experience. In November 2002, Fagan filed a complaint on behalf of plaintiffs against Pruett, Baron, Keys, and PCG regarding the Kelley Creek property in Multnomah County Circuit Court. Fagan did so despite a clause in the Sunrise operating agreement requiring arbitration of disputes. When Keys's lawyer pointed out the requirement for arbitration, Fagan stipulated to dismissal of the complaint in January 2003, and the parties agreed to binding arbitration.

Fagan then failed to promptly pursue arbitration. Fagan did not file plaintiffs' arbitration statement until December 2003. The 2003 arbitration statement that Fagan filed contained the same claims that were in the circuit court complaint, plus it alleged that Baron had breached fiduciary duties as an agent. The arbitration statement did not allege an oppression claim and did not contain a demand for a compulsory buyout of Rowlett's interest in Sunrise. The statement did not name Sunrise as a party, although Sunrise held the property rights. One of the lawyers for Keys and PCG testified at trial that, had Fagan promptly pursued arbitration, federal Securities and Exchange Commission rules would have required Keys and PCG, as investment advisors, to report the pending action, and that would have "pressure[d]" his clients to seek "a complete resolution of the matter fairly quickly."

In the absence of any legal action on plaintiffs' behalf, the other Sunrise members took actions that adversely affected Rowlett in 2003. On March 13, 2003, Pruett and Baron, through a consent resolution, removed Rowlett as a manager of Sunrise. Shortly thereafter, Sunrise announced a capital call to raise money to prevent foreclosure on one of the Sunnyside Road properties and demanded that Class B members, including Rowlett, contribute over $600,000 to Sunrise. If Rowlett did not contribute the capital, his interest in Sunrise would be diluted. Fagan advised Rowlett that he need not respond to the capital call. Eventually, the

principals at Sunrise began operating the company according to an amended and restated operating agreement, although the effectiveness of that document was disputed between the parties.

Fagan also did not take steps to press the litigation during 2004 or the first part of 2005, before he left Schwabe in May to take another position. The parties mediated in August 2004, but that effort failed. Fagan did not obtain and review documents from the Sunrise opponents, seek admissions, conduct depositions, or hire experts, either before or after the mediation.

When Fagan left, Finn, a partner with Schwabe, took over the case and met with Rowlett. Finn began reviewing the file immediately but did not bill for any work on the case until October 25, 2005, when he began to look for an arbitrator. One of the lawyers for Keys and PCG testified that no one from Schwabe contacted her on the matter from December 2004 until October 2005, which is when she learned that Fagan had left Schwabe.

In the meantime, additional adverse actions were taken against Rowlett in Sunrise. During the summer of 2005, Keys, Baron, and Robinson arranged for Sunrise to distribute $5.8 million to themselves. Rowlett received nothing, although he remained a member. On October 7, 2005, Keys, Baron, and Robinson then removed Rowlett as a member of Sunrise.

After Finn initiated contact with opposing counsel in the Sunrise litigation, one of the lawyers for Keys and PCG informed Finn that the Sunrise defendants were going to move to dismiss for want of prosecution. Finn and Schwabe then tried to pursue plaintiffs' claim in the arbitration forum. In early 2006, Finn worked on preparing an amended arbitration statement to add Sunrise as a party to the arbitration, drop Pruett as a party to the arbitration, and add additional claims, including oppression and breach of fiduciary duty claims. In March 2006, the attorney for Keys and PCG objected to further arbitration and filed a motion with the circuit court to reinstate the 2002 complaint and to dismiss it for want of prosecution. In April

2006, Finn filed the amended arbitration statement naming Baron, Keys, and Sunrise as respondents.

In September 2006, the circuit court granted the Sunrise defendants' motion to dismiss and, in February 2007, entered a judgment dismissing the claims pleaded in the 2002 circuit court complaint. The court concluded that the arbitration was not promptly conducted, to defendants' prejudice, and that Schwabe had delayed without justification in pursuing the case until Finn's active involvement after October 2005. Keys and PCG then sought an award of their attorney fees, which were over $180,000, and costs. After the circuit court dismissed the 2002 complaint, Finn initiated an appeal of the dismissal. He also attempted to pursue arbitration on the additional claims not asserted in the 2002 court complaint; that effort, though, was halted by the circuit court's order in December 2006 dismissing the arbitration.

In March 2007, Finn then filed a second complaint in Multnomah County Circuit Court against Sunrise, Baron, Keys, Robinson, Keys Family Holdings Co., LLC, and Robinson & Sons, LLC. It was nearly identical to the amended arbitration statement from 2006, except for the additional parties and allegations related to them. The 2007 complaint included an oppression claim asserted by Rowlett against all defendants as well as breach of fiduciary duty claims that plaintiffs or Rowlett variously asserted against Baron, Keys, Robinson & Sons, and Sunrise. The Sunrise defendants sought to have the oppression claim dismissed in motions under ORCP 21 A(8) for failure to state a claim; however, the circuit court denied the motions.

Then, in November 2007, the Sunrise principals served plaintiffs with an offer of judgment for $200,000 and plaintiffs' reasonable attorney fees, as determined by the circuit court, in the 2007 action. By that time, plaintiffs had paid approximately $200,000 in attorney fees to Schwabe for the Sunrise litigation. Finn advised Rowlett that, given the severe drop in the real estate market that had occurred, in the best case, plaintiffs' recovery from the Sunrise opponents might not exceed the amount of fees already paid to Schwabe. Plaintiffs accepted the offer of judgment in

December 2007. The court awarded only part of the fees Schwabe had billed plaintiffs for work on the 2007 action. Through the 2007 settlement, plaintiffs received less than $260,000, including the payment of attorney fees. They also dropped their appeal of the dismissal of the 2002 complaint and released their claims against the Sunrise opponents, and the prevailing Sunrise defendants in the initial litigation that began in 2002 withdrew their pending attorney fee petition.

C. *Plaintiffs' malpractice action against defendants*

In 2009, plaintiffs filed suit against defendants in this case, alleging that defendants had committed professional malpractice in the Sunrise litigation and had caused plaintiffs to settle for a fraction of what their Sunrise opponents would have paid plaintiffs had the matter been properly litigated. Plaintiffs alleged negligence claims against defendants that included numerous specifications, generally relating to failures to diligently prepare and pursue claims, to competently represent their interests, to properly advise them, and to properly staff the 2002 case and the 2003 arbitration. One of the specifications of negligence was that defendants had failed to timely recognize and allege an oppression claim in the Sunrise litigation. Plaintiffs also alleged claims for negligent misrepresentation, negligent supervision, breach of fiduciary duty, money had and received, unjust enrichment, *quantum meruit,* and conversion.

As for damages on plaintiffs' negligence claims against defendants, in their third amended complaint, plaintiffs alleged that defendants had caused the following damages:

"a.   The difference between the settlement amount in the 2007 case and:

"i.   the value of Plaintiff Rowlett's equity interest in Sunrise Partners LLC as of either March 13, 2003 or October 7, 2005, which is $2,200,000;

"ii.   the amount that Plaintiff Rowlett paid to maintain the option on the Kelley Creek property, which is $90,036.88;

> "iii.   the amount of the Brown Note, which is $150,000 plus 8% interest per annum from the date of February 11, 2000, for a total of $270,000 [one of the plaintiff companies signed the note in favor of Brown, an investor]; and

> "iv.   the amount of legal fees owed to Hagen Dye, which is $18,500 [to prepare private investment solicitation documents]; and

> "b.   Plaintiffs' attorney's fees and costs in the amount of $214,207.91 paid to Schwabe."

Plaintiffs also alleged a right to recover prejudgment interest as of October 7, 2005.

In their second amended complaint, plaintiffs had alleged a right to recover, as part of their damages on the negligence claim, their "attorney's fees and costs in this action as plaintiffs' reasonably foreseeable damages in an amount to be determined at trial because these fees and costs are ongoing." Defendants challenged that damages allegation through a summary judgment motion. At the hearing on the motion, plaintiffs explained that their theory of recovery was based on the fact that the fees they were incurring in the malpractice action served as an appropriate proxy for the amount of fees that they would have been entitled to recover from the Sunrise defendants by virtue of the attorney fee provision in the operating agreement. The court granted defendants' summary judgment motion on that element of damages.

Thirteen days before trial, defendants moved against the third amended complaint, the operative complaint at trial, seeking dismissal of various claims and some individual allegations under ORCP 21 G(3). Defendants sought dismissal of allegations of damages on the negligence claim consisting of fees that plaintiffs had paid to Schwabe, and the trial court granted that motion. Defendants also moved to dismiss plaintiffs' allegation that defendants had failed to timely allege an oppression claim in the underlying action, and the trial court granted that motion.

Ultimately, the trial court held a jury trial on the negligence, negligent misrepresentation, and breach of fiduciary duty claims. The jury found that all defendants were

negligent in their representation of plaintiffs. However, the jury also found that defendants' negligence was not "a cause of damage to plaintiffs[.]"[1]

As noted at the outset, on appeal, plaintiffs assert seven assignments of error, and we address four of them. We first address plaintiffs' assignment of error to the trial court's dismissal, under ORCP 21 G(3), of their specification of negligence relating to the timeliness of defendants' assertion of the oppression claim, followed by the assignment concerning the verdict form. Last, we address plaintiffs' contention that the trial court wrongly prevented the jury from considering two items of their claimed damages for defendants' negligence relating to attorney fees.

## II. NEGLIGENCE REGARDING OPPRESSION CLAIM

Pursuant to ORCP 21 G(3), defendants moved just before trial to dismiss all of the claims in the third amended complaint, with the exception of plaintiffs' claim for the return of approximately $21,000 that they had paid to Schwabe for the 2007 litigation but that the circuit court had not awarded as reasonable fees in connection with settlement. Defendants couched their motions to dismiss in terms of plaintiffs' failure to allege sufficient facts to state a claim.[2] The trial court granted the motion in part. In their first assignment of error, plaintiffs challenge the trial court's dismissal of their negligence allegation that defendants had failed to timely assert an oppression or "squeeze-out" claim against the Sunrise principals. We conclude that the court erred in dismissing that specification of negligence.

---

[1] After the jury rendered its verdict, the trial court decided plaintiffs' equitable claim that they were entitled to recover the difference between the amount of fees that they had paid to Schwabe for the part of the Sunrise litigation based on the 2007 complaint and the amount that the circuit court deemed a reasonable fee (and the Sunrise defendants paid) as part of the settlement. The trial court ruled in favor of Schwabe, and plaintiffs do not appeal that ruling.

[2] Defendants contended that plaintiffs had failed to allege ultimate facts sufficient to state a claim for relief and acknowledged that, for purposes of their motion, they did not "dispute plaintiffs' allegations of fact." Defendants argued that the complaint boiled down to a "list of abstract acts and omissions" by defendants along with a "list of claimed 'damages.'" Continuing, defendants asserted that plaintiffs "entirely omit the essential ultimate facts which tie these two lists together" and that "no reasonable juror could infer from the facts" alleged that defendants were negligent.

We begin by clarifying the procedural posture of defendants' motion, which affects our review. ORCP 21 G(3) relates to the waiver or preservation of certain defenses and provides as follows:

"A defense of *failure to state ultimate facts constituting a claim,* a defense of failure to join a party indispensable under [ORCP] 29, and an objection of failure to state a legal defense to a claim or insufficiency of new matter in a reply to avoid a defense, *may be made in any pleading* permitted or ordered under [ORCP] 13 B *or by motion for judgment on the pleadings, or at the trial on the merits.* The objection or defense, if made at trial, shall be disposed of as provided in [ORCP] 23 B in light of any evidence that may have been received."

(Emphasis added.) Thus, under ORCP 21 G(3), the failure-to-state-a-claim defense may be asserted at three times: "(1) in any pleading permitted or ordered under [ORCP] 13 B; (2) by motion for judgment on the pleadings; and (3) at the trial on the merits." *Waddill v. Anchor Hocking, Inc.,* 330 Or 376, 381-82, 8 P3d 200 (2000), *adh'd to on recons,* 331 Or 595, 18 P3d 1096 (2001). The defense is "otherwise unavailable." *Id.* at 382.

Because defendants asserted plaintiffs' failure to state ultimate facts in their complaint, plaintiffs responded to the motion, in part, by citing *Waddill* and arguing that ORCP 21 G(3) does not provide a mechanism for a defendant to seek dismissal for failure to state a claim just before trial, after defendants had already filed an answer to the third amended complaint asserting the same defense. Plaintiffs did not perceive the motion as one for judgment on the pleadings and said as much, and defendants never stated that their motion was one for judgment on the pleadings.

As noted, the trial court went forward and considered defendants' motion. The trial court's ruling, however, was not based on the procedural problem with the motion asserted by plaintiffs and instead was based on the merits of a potential oppression claim by an LLC member in Oregon. The court ruled:

"As to the oppression claim, it's also out. The plaintiff has not provided me with any basis to permit this except

for the broad language of the LLC statute and I disagree with you. I don't think it's as broad—I think it's actually more restrictive and it does not include the opportunity to demonstrate oppressive conduct.

"*****

"*** I'm not saying as a matter of law there is no such thing as a—an oppression or squeeze-out claim under an LLC. I'm saying the plaintiff has not provided me with a basis for it. I'm still wondering out there. I still think there might be something out there, but I haven't been shown it."

Even though defendants did not properly put plaintiffs on notice that their motion was one for judgment on the pleadings, given the parties' and the trial court's ultimate treatment of the motion below, we review the motion as one for judgment on the pleadings under ORCP 21 B. Such a motion can be made after the pleadings are closed and before trial. *See* ORCP 21 G(3) (providing that the defense of failure to state a claim may be made by motion for judgment on the pleadings); ORCP 21 B ("After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings."). Once the court determined that it would address the motion to dismiss, plaintiffs also presented arguments on the merits of defendants' motion that plaintiffs could not prevail on the specification of negligence.

A showing "that the nonmoving party cannot prevail as a matter of law" is the basis for a motion for judgment on the pleadings. *Pendergrass v. Fagan*, 218 Or App 533, 537, 180 P3d 110, *rev den*, 344 Or 670 (2008). However, as we have recently emphasized, "the propriety of judgment on the pleadings is based on an assessment of the parties' *allegations* in the pleadings[.]" *Lehman v. Bielenberg*, 257 Or App 501, 508, 307 P3d 478 (2013) (emphasis in original). "On review of a judgment on the pleadings, an appellate court accepts as true all well-pleaded allegations of the complaint." *Boyer v. Salomon Smith Barney*, 344 Or 583, 586, 188 P3d 233 (2008). An appellate court does not rule on issues of fact. *Id.* Judgment on the pleadings can be granted only "when the pleadings taken together affirmatively show" that the plaintiff has "no cause of action against the

defendant" or when the defendant "affirmatively alleges a complete defense," which the plaintiff admits in the reply. *Salem Sand v. City of Salem*, 260 Or 630, 636, 492 P2d 271 (1971). We review the trial court's ruling for legal error. *See Withers v. State of Oregon*, 133 Or App 377, 382, 891 P2d 675, *rev den*, 321 Or 284 (1995) (stating that we review "as a matter of law").

Therefore, to obtain a judgment on the pleadings, defendants had the burden to establish that, *assuming the truth of the allegations in the complaint,* they were entitled to prevail on that part of plaintiffs' negligence claim. Looking solely at the allegations in the complaint, plaintiffs sufficiently alleged negligence.

A plaintiff who alleges legal malpractice must prove "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, *i.e.*, a causal link between the breach of duty and the harm." *Stevens v. Bispham*, 316 Or 221, 227, 851 P2d 556 (1993) (emphasis omitted). Lawyers owe their clients a duty of care. *Pereira v. Thompson*, 230 Or App 640, 654, 217 P3d 236 (2009).

Plaintiffs alleged that the oppression claim arose in 2003 and that defendants did not assert an oppression claim on Rowlett's behalf against the Sunrise defendants until the 2006 amended arbitration statement and the 2007 action. Plaintiffs' complaint also alleged that defendants had charged plaintiffs for their services and had plaintiffs pay for an expert to prove the oppression claim. Plaintiffs further alleged that had defendants "arbitrated the dispute, asserted the squeeze-out/oppression claims, retained a damages expert, and understood how to prove 'fair value,' in a timely manner between 2003 and 2005, plaintiff Rowlett would have received more monetary value for his Sunrise ownership interest." In other words, plaintiffs alleged a duty of care and breach of the duty (their oppression claim existed and arose in 2003 and defendants should have asserted it earlier in the litigation) and causation and damages (plaintiffs were financially damaged because defendants asserted the oppression claim later, in 2006 and 2007). We must assume that those allegations are true, and, based on those

allegations, plaintiffs would prove negligence. Therefore, the trial court erred in concluding that defendants were entitled to judgment on the pleadings.

In actuality, although defendants said that they were assuming the truth of plaintiffs' allegations, defendants' motion attacked the truth of those allegations. Specifically with regard to the alleged failure to timely assert the oppression claim, defendants and the trial court focused not on the allegations in the pleading but instead on defendants' assertion that "plaintiffs never had a viable claim of that type" because oppression claims are "statutorily based" and the LLC statutes do not allow a claim for oppression to be brought by an LLC member.

The trial court accepted defendants' premise that, to avoid a judgment on the pleadings and dismissal of their negligence theory, plaintiffs had to establish with certainty that an oppression claim would have been viable in the underlying Sunrise litigation. Plaintiffs acknowledged that there was no Oregon case that discussed oppressive conduct with respect to the LLC statutes, and the court concluded that plaintiffs were relying on broad language in the LLC statutes that was unpersuasive and that those statutes do not "include the opportunity to demonstrate oppressive conduct." Given those conclusions and the trial court's knowledge that defendants had successfully asserted an oppression claim on Rowlett's behalf in the Sunrise litigation, after which the Sunrise defendants offered to settle in 2007, it is apparent that the trial court placed the burden on plaintiffs to establish the viability of the oppression claim as a legal matter, regardless of what plaintiffs had alleged. However, that is not the applicable standard on a motion for judgment on the pleadings.

Had defendants wanted to test plaintiffs' *proof* before trial, the pretrial motion under ORCP 21 G(3) was not the proper vehicle to do so. Rather, defendants could have filed a timely motion for summary judgment under ORCP 47 if they had believed that there was no material dispute of facts and that they were entitled to judgment as a matter of law. Plaintiffs, though, could well have established defendants' breach of the duty of care, as plaintiffs

alleged, through an expert. *See Vandermay v. Clayton*, 328 Or 646, 655, 984 P2d 272 (1999) (stating that, as in other professional malpractice actions, a plaintiff in a legal malpractice action must provide expert testimony to establish a breach of the standard of care when issues are beyond common knowledge of lay jurors); ORCP 47 E (if an expert opinion establishes a genuine issue of material fact, an affidavit or a declaration of the nonmoving party's attorney "stating that an unnamed qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact, will be deemed sufficient to controvert" the motion). And, to the extent that defendants were contending that plaintiffs' allegation of negligence as to the untimely oppression claim was a sham that could never be proved, defendants could have earlier and timely filed a motion to strike the allegation as sham under ORCP 21 E. *See, e.g., Andrysek v. Andrysek*, 280 Or 61, 69 n 8, 569 P2d 615 (1977) ("A sham plea is one good in form but false in fact; it is a pretense because it is not pleaded in good faith."); *Kashmir Corp. v. Nelson*, 37 Or App 887, 892, 588 P2d 133 (1978) ("A pleading may be stricken as sham when its allegations appear false on the face of the pleading.").[3] Defendants did neither.

Moreover, even if defendants' view of the law now were to turn out to be correct, that is, were we or the Supreme Court at some point to hold that an equitable claim for oppression in the LLC context is not cognizable in Oregon, defendants still could have breached their duty of care by failing to assert a colorable claim of oppression earlier in the Sunrise litigation. That is so for three reasons.

First, there can be no question that the claim was colorable, a fact that Finn, Schwabe, and the circuit court in

---

[3] The allegations, however, were not obviously false. Indeed, plaintiffs established, through evidence that they submitted in opposition to the motion, that (1) defendants had made factual allegations in the oppression claim it asserted in 2007 that were similar to those that plaintiffs contended defendants should have made earlier in the Sunrise litigation; (2) as Rowlett seeks in this action, defendants sought relief for Rowlett based on an amount equal to Rowlett's interest in Sunrise; (3) defendants had supported the oppression claim with arguments similar to those plaintiffs make here; and (4) another judge of the Multnomah County Circuit Court had rejected motions by the Sunrise defendants to dismiss the oppression claim asserted in the 2007 complaint under ORCP 21 A.

the 2007 Sunrise litigation recognized. As noted, plaintiffs both alleged and established that Finn and Schwabe had actually successfully asserted the oppression claim in the complaint on behalf of Rowlett in the Sunrise litigation in 2007. In doing so, as plaintiffs observed in the trial court, Finn certified, pursuant to ORCP 17 C(1), that the claim was "warranted by existing law or by a nonfrivolous argument for the extension * * * of existing law or the establishment of new law." ORCP 17 C(3). An oppression claim in the LLC context, although one not ironclad given the lack of a definitive governing case in Oregon, has support in the law.

Notwithstanding defendants' current argument that the absence of a remedy for "oppression" in the LLC statutes is conclusive, the legislative history of Oregon's Limited Liability Act (the LLC Act) suggests that the LLC Act need not be construed as exclusive, exhaustive, or somehow self-contained with respect to the application of legal doctrines relevant to actions taken by LLC members and managers. Instead, there is some evidence that the legislature recognized and anticipated both the applicability of prior-existing common-law doctrines as well as the prospect of judicial development of the statute.

During a Senate Judiciary Committee meeting, Senator Shoemaker and Donald W. Douglas, co-chair of the Oregon State Bar LLC Task Force engaged in the following colloquy:

"[MR. DOUGLAS:] There is some language, section * * * 30 sub part 2, I believe, that says that members are not liable solely from their status as members. This legislation—and we have commentary to make this clear—does not change the law on apparent authority. It merely says that * * * a member who is not a manager would not from that status alone have apparent authority. If they act in a way which creates apparent authority, that doctrine will still apply. So there is no change in that. It just doesn't arise from the status.

"* * * * *

"[SEN. SHOEMAKER:] I guess I'd like the record to show that there's nothing in the bill or in section 30 of the bill that would change the common law regarding apparent

authority and liability of the [LLC] for someone who is acting with apparent authority. It's just that the bill deals with one specific instance of granting explicit apparent authority to managers. But if any other person operating for a limited liability company, under the facts had apparent authority as the law has developed that doctrine, there would still be liability. There's no intention to change that underlying common law regarding the liability for apparent authority. Would that be a correct statement?

"[MR. DOUGLAS:]  Mr. Chairman, Senator Shoemaker, that is correct."

Tape Recording, Senate Committee on Judiciary, SB 285, Feb 12, 1993, Tape 25, Side A. An additional exchange, between Representative Baker and David C. Culpepper, the other co-chair of the LLC Task Force, from a meeting of the House Judiciary Subcommittee on Civil Law, also undermines defendants' premise:

"[REP. BAKER:]  Is a limited liability company—is that a security?

"* * * * *

"[MR. CULPEPPER:]  The statute doesn't specifically address it. But I think that would be the analysis—is that it depends on the definition in the securities law of what is a security is, uh, an investment that depends on the management of others. And for a passive investor in a limited liability company, it would likely be held to be a security. But for somebody who is actively involved in the business, it might or might not be. But it would be determined by the regulations under the securities laws and by the courts."

Tape Recording, House Committee on Judiciary, Subcommittee on Civil Law, SB 285, May 19, 1993, Tape 116, Side A.

In addition, the commentary to the LLC Act makes clear that the Act's drafters based the dissolution section of the LLC Act on preexisting statutory law regarding limited partnerships based on the tax structure of an LLC. The Summary and Commentary, Limited Liability Company Act SB 285 (LLC Act commentary) stated:

"This [dissolution] section lists the events that cause an LLC to be dissolved. The section follows, in large part, the

structure of ORS 70.325. A partnership is the best disso-
lution analog for an entity seeking partnership tax status.
Moreover, the limited partnership scheme was considered
preferable to the general partnership provisions because
general partnerships encounter inapposite problems inci-
dent to the unlimited joint and several liability of their
partners. This is also consistent with all LLC statutes
passed to date in other jurisdictions."

Testimony, Senate Committee on Judiciary, SB 285, Feb 22,
1993, Ex J, 17. However, the legislature did not specifically
foreclose equitable remedies in the event of a squeeze-out or
oppression of a minority member in an LLC.

In fact, there is evidence that the legislature
anticipated that nonstatutory relief would be available for
aggrieved members. In the section describing the duty of
loyalty standard of conduct applied to LLC members and
managers, now codified in ORS 63.155(2) and (9)(b), the
LLC Act commentary states that the LLC Act's "duty of
loyalty" standard was adopted from "the partnership form
of the 'duty of loyalty.'" Testimony, Senate Committee on
Judiciary, SB 285, Feb 22, 1993, Ex J, 8. And, the LLC Act
commentary suggests that the proponents anticipated judi-
cial development of that duty of loyalty that would in turn
apply to protect the interests of members—necessarily sug-
gesting that the statutory standard of conduct and reme-
dies for violations were not static and bound by the LLC Act
as enacted. Noting differences between liability in general
partnerships and LLCs, the LLC Act commentary states
that

"the existing and likely future judicial development of the
parameters of the partners' duty of loyalty is seen as ade-
quately protecting the interests of members. * * * Because
the duty of loyalty is owed and can be breached by all mem-
bers, whether or not the LLC has managers, this duty of
loyalty is extended to all members."

*Id.* (citation omitted).

It was well established at the time of the enactment
of the LLC Act that joint venturers or partners owed each
other various fiduciary duties. *See Delaney v. Georgia-Pacific
Corp.*, 278 Or 305, 310, 564 P2d 277 (1977). The ousted joint

venturers in *Delaney* were entitled in equity to recover, from the others who had breached their fiduciary duties, the fair price of their shares as of the date of the ouster. 278 Or at 324-25. The Supreme Court also had recognized by then, before Oregon's close-corporation statute was amended, when dissolution was the only form of statutory relief available, that a minority shareholder in a close corporation could seek other remedies in equity for oppressive conduct by majority shareholders in violation of their fiduciary duties, as an alternative to dissolution. *Baker v. Commercial Body Builders*, 264 Or 614, 629, 631-33, 507 P2d 387 (1973) (citing *former* ORS 57.595 (1965), *repealed by* Or Laws 1987, ch 52, § 181). The *Baker* court listed a number of potential equitable remedies, including a compulsory buyout of the minority shareholder's interest. *Id.* at 633. And, decisions from courts in other jurisdictions permit oppression claims by LLC members with minority interests seeking equitable remedies. *See, e.g., OLP, L.L.C. v. Burningham*, 2009 UT 75, ¶¶ 14-23, 225 P3d 177, 181-84 (the Utah LLC statutes did not preempt common law claims and remedies for disputes among members). At the very least, it was possible for plaintiffs to establish that the oppression claim in the Sunrise litigation had teeth.

Second, the facts alleged indicate that the oppression claim could have been made much earlier. For example, as plaintiffs alleged, defendants could have asserted the oppression claim in the Sunrise litigation as early as 2003, when the Sunrise defendants removed Rowlett as a manager.

Third, such an assertion of a colorable claim could have altered the outcome for Rowlett considerably by giving him increased leverage to secure a settlement on much more favorable terms than what he obtained in 2007. That potential is captured in plaintiffs' broad pleading of the claim.[4]

---

[4] And, outside the context of the pleadings, it is now evident that plaintiffs had evidence to support that theory. We know from the trial that plaintiffs had proof that, after the Sunrise defendants lost their ORCP 21 motions in an attempt to have the court dismiss the oppression claim that Finn and Schwabe asserted in 2007, they served an offer of judgment and entered into a settlement with plaintiffs. Plaintiffs also had proof in the form of testimony from their expert, Ellis, and from the Sunrise defendants' own lawyer, that had the oppression claim been asserted as early as in 2003, the Sunrise opponents would have immediately attempted to settle. The feasibility of a settlement was also supported

The trial court failed to accept and analyze the allegations in the complaint to determine whether there was "no cause of action" against defendants.[5] *Salem Sand*, 260 Or at 636.

As a backstop to our determination that the trial court erred, defendants argue that the trial court's dismissal of the negligence specification is harmless in light of what occurred at the end of the jury trial, when the trial court declined to award equitable relief to plaintiffs regarding some of their attorney fees. Defendants note that plaintiffs' oppression claim was equitable and would have been determined by the trial court, and from there they reason that the trial court would not have awarded plaintiffs relief for oppression, which would have been contrary to the jury's "no damages" conclusion. However, because we are remanding for a new trial on the negligence claim, as we next discuss, the outcome of that trial may be different, and the trial court may not have a jury verdict of "no damages" to consider when deciding an equitable oppression claim. Accordingly, we reject defendants' harmless-error argument and reverse the dismissal of the specification of negligence.[6]

---

by the fact that the Sunrise defendants paid themselves—but not Rowlett—$5.8 million dollars from Sunrise's assets in 2005.

[5] The concurrence concludes that we should decide whether Oregon law recognizes an oppression claim by an LLC member with a minority interest and that the manner in which we resolve the assignment of error "does not reflect the theory on which the issue was presented." 262 Or App at 699 (Armstrong, P. J., concurring). That is simply incorrect. As already noted, plaintiffs presented evidence to the trial court that Finn and Schwabe knew that the claim had legs because they already had had success in asserting the oppression claim on Rowlett's behalf in the same court before a different judge, albeit in the 2007 phase of the Sunrise litigation. Plaintiffs argued below that the allegations in the complaint stated a cause of action for negligence based on defendants' failure to timely recognize and assert the oppression claim: "Thus, defendants sufficiently alleged a squeeze-out claim on plaintiffs' behalf in the 2007 case, and plaintiffs adequately allege the malpractice claims on that basis as well." In addition, plaintiffs sought to convince the trial court that such a claim had legal merit given defendants' argument to the contrary. Plaintiffs argued that the facts and law "argued in the 2007 case by defendants Finn and Schwabe were enough to defeat the motions to dismiss then and should be enough to defeat the motions to dismiss now." On appeal, plaintiffs assert that it "should not be necessary to pause and spend valuable ink establishing that this Court accepts the complaint's allegations as true and draws all inferences in favor of Rowlett. It is necessary here."

[6] The parties also dispute whether, if Rowlett were to succeed on the negligence specification concerning the oppression claim, his damages would equate to a buyout of his interest in Sunrise. The trial court did not reach that issue, and we do not either.

## III.   VERDICT FORM

In their third assignment of error, plaintiffs contend that the verdict form misled the jury regarding its consideration of damages and, more specifically, of how much Rowlett was damaged by losing his interest in Sunrise. That, in turn, depended in part on the date used to value that interest.

At trial, plaintiffs' experts testified that the value of Rowlett's interest in Sunrise was significant and should be fixed as of one of two alternative dates: (1) over 2 million dollars as of October 7, 2005, after the multimillion dollar distribution to the other members and Rowlett's removal as a member of Sunrise, or (2) over 1 million dollars as of March 13, 2003, when Rowlett was removed as a manager of Sunrise. Defendants responded with expert testimony that the value of Rowlett's interest in Sunrise on those two dates was much lower, approximately $108,000 or $355,000 as of October 2005 and only $30,000 as of March 2003. Finn testified that he had concluded that the settlement amount approximated the value of Rowlett's interest in Sunrise at the time, in December 2007, and defense expert attorney Peter Richter testified that the amount of the settlement was reasonable.

The verdict form that went to the jury asked in pairs of questions whether the particular defendant was "negligent in one or more of the ways plaintiffs claim" and, if yes, was that defendant's "negligence a cause of damage to plaintiffs[.]" The jury answered yes to questions 1, 3, and 5 (in turn, Fagan, Finn, and Schwabe were negligent). The jury answered no to each defendant's negligence being "a cause of damage to plaintiffs" in questions 2, 4, and 6. As a result, the jury was directed to skip over questions 7 through 10, which focused on damages, and to go on to the next claim.

Plaintiffs contend that the trial court erred with regard to the verdict form because part of question 10 contained an erroneous third date, December 7, 2007—the settlement date—for the jury's use as it determined the value of Rowlett's interest in Sunrise. Question 10 in the verdict form focused on the amount of plaintiffs' damages and contained three primary questions:

"A.   What is plaintiffs' total damage?

"ANSWER: $_____.

"B.   What forms the basis, by category, for the total damages listed in subsection A? The difference between the settlement in the 2007 case and:

"a.   The value of Gerald Rowlett's equity interest in Sunrise Partners?

"ANSWER: $_____.

"b.   The amount that Gerald Rowlett paid to maintain the option on the Kelley Creek property?

"ANSWER: $_____.

"*If you entered a dollar amount in 10(B)(a), then answer 10(C).*

"C.   What was the valuation date of Gerald Rowlett's equity interest in Sunrise Partners?

"ANSWER: (March 13, 2003, October 7, 2005, or December 7, 2007)

"_____."

Plaintiffs contended that the two alternative dates they initially listed in part C as valuation dates were supported by the evidence and Oregon law. The March 2003 date was when the Sunrise principals removed Rowlett as a manager, and the October 2005 date was when Rowlett was removed as a member. Plaintiffs' expert, attorney Barnes Ellis, supported the use of those dates, testifying that the correct valuation date for Rowlett's interest in Sunrise was the completion of the wrongdoing by the majority members and that a member's interest is valued at the time of trial only when the company's value has increased. Plaintiffs explained to the court that a valuation date was needed for a prejudgment interest award should they prevail.

Defendants argued that, if valuation dates were going on the verdict form, then the date of the Sunrise settlement should be added and was a permissible date for establishing the value of Rowlett's Sunrise interest, in accordance with Finn's testimony. Plaintiffs objected, arguing that the evidence did not support the settlement date being included as a valuation date. The trial court agreed with defendants.

On appeal, the parties dispute the propriety of placing the December 2007 date on the verdict form and whether any error was prejudicial. Defendants also contend that plaintiffs did not preserve their assignment of error for appeal. Therefore, before reaching the merits, we begin with the issue of preservation.

Plaintiffs argued below that there was no basis in the evidence or support in the law for using December 7, 2007, as a valuation date for Rowlett's interest in Sunrise, and they reiterate that that was error in this court. Yet defendants posit that, to preserve their assignment for appeal, plaintiffs also were required to argue to the trial court that the addition of the valuation date would be misleading to the jury's determination of damages. Defendants' preservation argument "confuses preservation of error with harmless error." *State v. Taylor*, 182 Or App 243, 247, 48 P3d 182 (2002). We normally do not require trial counsel to identify in the trial court, in addition to the basis for the trial court's error, "why that error is so prejudicial that it may be deemed reversible error on appeal." *Id.* at 248. We conclude that plaintiffs' argument to the trial court specifying their foundation objection sufficiently preserved the assignment of error. *See, e.g., State v. Whitmore*, 257 Or App 664, 666-67, 307 P3d 552 (2013) (we will consider a party's assignment of error on appeal when that party raised the issue below with enough particularity to permit the trial court to identify and to correct its alleged error immediately).

We turn to the merits of plaintiffs' assignment. "A verdict form is similar to an instruction in the sense that the court submits it to the jury and requires the jury to follow it." *Nolan v. Mt. Bachelor, Inc.*, 317 Or 328, 336, 856 P2d 305 (1993). Also similar to a jury instruction, if the verdict form given contains an error, the error is reversible if it "probably created an erroneous impression of the law in the minds of the jurors" that "affected the outcome of the case." *Id.* at 337 (internal quotation marks omitted).

On appeal, plaintiffs again argue that the evidence did not permit the court to add the settlement date as a valuation date for Rowlett's interest in Sunrise. They argue that Finn never testified that December 7, 2007, was an appropriate valuation date for Rowlett's interest and neither did

Richter, defendants' expert. Thus, for valuation dates, the court had Ellis's testimony alone. Citing *Delaney*, plaintiffs contend that Ellis was right and that the court gave the jury an incorrect understanding of the legally permissible valuation dates.

Defendants do not deny that neither Finn's nor Richter's testimony established that Rowlett's interest in Sunrise *should* be valued on the date of settlement. That is correct, because Finn only testified that the settlement amount approximated the value of Rowlett's interest at the time, in December 2007. In response, defendants instead assert that no error occurred because they never argued to the jury that the settlement amount fixed the value of Rowlett's interest in Sunrise—just that the settlement was reasonable in light of a variety of considerations. Defendants do not address whether it was proper to add the settlement date as a valuation date on the verdict form, and they again appear to conflate harmless error with legal error.

As for the propriety of the trial court's ruling, we agree with plaintiffs. There was no expert testimony that the settlement date was permissible, and *Delaney* supports plaintiffs' expert's testimony to the contrary—the minority owner's interest in the business is generally valued at a high point or when the improper conduct culminated, not at a low point coinciding with, for example, the time of trial. The defendants in *Delaney* assumed control over a joint venture on June 20, 1975, in violation of their fiduciary duties to the minority. 278 Or at 324-25. The Supreme Court ordered that the minority's share "price should be determined as of June 20, 1975, the date when we have found that the entire management of the venture was taken over by" the defendants. *Id.* Thus, the trial court erroneously permitted the jury to consider a valuation date that had no basis in the expert testimony or, it appears, in Oregon law.

Plaintiffs next contend that the error was harmful because the jury was likely misled into concluding that the value of Rowlett's interest in Sunrise on the settlement date was the amount of the settlement and therefore that plaintiffs had no damage. In particular, plaintiffs contend that defendants were able to tell the jury in closing argument that the proper valuation date for Rowlett's interest in

Sunrise was the settlement date because that was "Finn's approach to damages" and that the settlement amount was reasonable, based on "what really happened" with the project and what Rowlett "really had a piece of." As a result, plaintiffs argue, defendants urged the jury to answer "no" to the questions on the verdict form asking whether defendants' negligence had caused plaintiffs damage, and the jury responded by returning the verdict suggested.

Even though, as defendants assert, they never directly argued to the jury that the settlement amount fixed the value of Rowlett's interest in Sunrise, defendants cannot overcome the effect of arguments that they did make to the jury that are salient to prejudicial error in this case. Defendants argued to the jury that it should use the settlement date as the date to "value" Rowlett's interest in Sunrise as it was considering whether plaintiffs were damaged. Defense counsel told the jury, "the date that you set for a value is the date the case settled. December 7th, 2007." Defendants further argued to the jury that Finn's settlement assessment was reasonable, and that the jury should answer "no" to the question of negligence being "a cause of damage to plaintiffs[.]" Again, Finn testified that he had concluded that the settlement amount approximated the value of Rowlett's interest in Sunrise at the time of the settlement in December 2007. Defendants, therefore, urged the jury's reliance on the incorrect valuation date allowed by the court, at a time when Sunrise's value was very low due to the significant drop in the residential real estate market in late 2007, and argued that plaintiffs suffered no damages.

Defendants further argue that we must affirm because plaintiffs bear the burden to establish the "basis for the jury's decision," but we cannot tell why the jury came to its verdict. Defendants note that the jury never reached question 10 at all and that it was possible that the jury determined that Rowlett suffered no damages based on the evidence as to *any* of the valuation dates on the verdict form, or that the settlement amount approximated the value of Rowlett's interest in Sunrise at the time, or that plaintiffs had not otherwise "proved their case," apparently a reference to causation of damages.

For their "we can't tell" argument as to harm, defendants rely on *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 61 P3d 928 (2003), and *Reeves v. Reeves*, 203 Or App 80, 125 P3d 755 (2005), *rev den*, 340 Or 308 (2006). Neither *Shoup* nor *Reeves*, however, apply to the circumstances in this case. *Shoup* concerned asserted error pertaining to one of three particular specifications of negligence, but the jury returned a general verdict for the plaintiff. 335 Or at 167. The Supreme Court held that "appellate courts, to act within statutory limitations, may not apply the 'we can't tell' rule to order a new trial in a case involving a judgment on a general verdict based on multiple specifications, one of which is invalid, if there is evidence to support another, valid specification." *Id.* at 176. *Reeves* was similar: the verdict form did not distinguish between the plaintiff's alternative theories of recovery for breach of contract on a number of promissory notes, and we rejected the defendant's argument on appeal that some of the notes considered by the jury were time-barred because the jury's verdict could have been based on the notes that were, without dispute, timely. 203 Or App at 85-86. Those are not the circumstances in this case, which involve the court's erroneous verdict form. "The context of a legal error is significant when determining whether an error committed at trial is harmless." *Dew v. Bay Area Health District*, 248 Or App 244, 256, 278 P3d 20 (2012).

Defendants incorrectly assume that, to establish prejudicial error when a court erroneously instructs the jury, plaintiffs must prove the basis for the jury's verdict. An instructional error presents a different concern for purposes of analyzing prejudice or harm than that presented in *Shoup*, as the Supreme Court has explained. In *Wallach v. Allstate Ins. Co.*, 344 Or 314, 326, 180 P3d 19 (2008), the court stated that "giving the jury an erroneous legal rule to decide an element" substantially affects a party's rights because we "presume that a jury follows a trial court's instructions[.]" (Footnote omitted.) And more recently, the court made clear in *Purdy v. Deere and Company*, 355 Or 204, 231-32, 324 P3d 455 (2014), that,

"[g]enerally speaking, if a trial court incorrectly instructs the jury on an element of a claim or defense, and—when the

instructions are considered as a whole in light of the evidence and the parties' theories of the case at trial—there is some likelihood that the jury reached a legally erroneous result, a party has established that the instructional error substantially affected its rights within the meaning of ORS 19.415(2)."

As noted above, the prejudicial effect of error on a verdict form, like instructional error, is assessed by whether it probably created an "erroneous impression of the law in the minds of the jurors" that "affected the outcome of the case." *Nolan*, 317 Or at 337 (internal quotation marks omitted). We agree with plaintiffs that the addition of the settlement date as one of the proper valuation dates was error that probably affected the outcome of the case, particularly with regard to whether plaintiffs suffered any damages at all. That is because defendants were able to and did argue, in line with the verdict form, that the jury should use the December 7, 2007, settlement date to value Rowlett's interest in Sunrise, that Finn's settlement assessment—which Finn testified approximated the value of Rowlett's interest in Sunrise at that time—was reasonable, and that the jury should answer "no" in response to the question on the verdict form asking whether defendants' negligence was "a cause of damage to plaintiffs[.]"[7] Causation was not truly in dispute. As a result, we conclude that plaintiffs are entitled to a new trial on the negligence claim.

## IV. ITEMS OF NEGLIGENCE DAMAGES

### A. *Attorney fees defendants failed to recover from opponents in the underlying case*

In their seventh assignment of error, plaintiffs assign error to the trial court's granting defendants' summary judgment motion and striking from their second amended complaint an item of their negligence damages. As pleaded, plaintiffs sought their "attorney's fees and costs in

---

[7] In light of our disposition of this assignment of error, we need not reach plaintiffs' related second assignment of error to the trial court's denial of their motion *in limine* to prohibit defendants' use of the settlement amount as a reflection of the actual value of Rowlett's interest in Sunrise. We also do not reach plaintiffs' assignments of error regarding testimony by defendants' accounting expert.

this action as plaintiffs' reasonably foreseeable damages in an amount to be determined at trial because these fees and costs are ongoing." That damage allegation was not artfully pleaded, and, at the hearing concerning defendants' motion on that item of damage, plaintiffs argued that they actually sought, as part of damages, the amount of attorney fees that they would have recovered from the Sunrise principals in the underlying litigation.

On appeal, plaintiffs note that the Sunrise operating agreement provided that a party who prevailed in a litigation action to enforce it was entitled to recover that party's reasonable attorney fees from opposing parties. Thus, plaintiffs contend, but for defendants' negligence, they would have recovered their attorney fees from their opponents in the Sunrise litigation, and the lost fees are recoverable damages in a legal malpractice action. *See Carter-Holmes v. Sousa*, 136 Or App 495, 499-500, 901 P2d 932 (1995), *rev den*, 322 Or 489 (1996) ("[T]he measure of damages in a malpractice action arising from the loss of a viable claim is generally the value of the putative 'lost judgment.'"). Indeed, although defendants object to plaintiffs' characterization of their pleading,[8] defendants agree that "damages in a legal negligence action may include the value of a claim 'lost' through the attorney's negligence" and, "where the lost claim included an entitlement to attorney fees, the injured client's damages can include recovery of such fees." On remand, plaintiffs can simply amend their complaint to state the item of damages, and the proof will be sorted out at trial. Accordingly, we do not reach the merits of plaintiffs' assignment of error.

B. *Attorney fees plaintiffs paid to Schwabe*

In their sixth assignment of error, plaintiffs contend that the trial court erroneously granted defendants' motion to dismiss and struck their allegation that they were

---

[8] Defendants also argue that plaintiffs already recovered their fees in settlement with the Sunrise opponents in 2007. Defendants overlook that the settlement included only part of plaintiffs' fees paid to Schwabe for the 2007 circuit court litigation and does not include all fees that plaintiffs contend would have been recovered from the Sunrise opponents had defendants properly pursued their claims in the underlying litigation from 2002 onward.

entitled to recover, as damages on the negligence claim, the attorney fees that they paid to Schwabe to represent them in the Sunrise litigation. We review this question, one of first impression in Oregon, for legal error, *Yanney v. Koehler*, 147 Or App 269, 272, 935 P2d 1235, *rev den*, 325 Or 368 (1997), and we affirm.

Plaintiffs begin their argument by citing *Sizemore v. Swift*, 79 Or App 352, 358, 719 P2d 500 (1986), to contend that, in Oregon, "attorney fees and other litigation expenses" that the client "had to incur as a result of the alleged malpractice" are recoverable. Based on that proposition, they assert that we should recognize that a client's recovery of fees paid to the client's lawyer is proper in a professional negligence action. Plaintiffs similarly rely on *Preble v. Schwabe, Williamson & Wyatt,* 128 Or App 249, 252, 875 P2d 526 (1994). However, recognizing that, in both *Sizemore* and *Preble*, we had held that clients were entitled to recover the attorney fees that they paid to other lawyers when the malpractice of their former lawyers involved them in other litigation, plaintiffs further argue that, "[w]hether paid to the malpracticing law firm or another shop, the client incurred fees he would not otherwise have spent." Arguing that they had to "pay twice for the same services[,]" plaintiffs rely on cases from some jurisdictions disallowing the defendant lawyer who committed malpractice in handling a contingent fee case from offsetting damages by the amount of the contingent fee that the plaintiff would have owed the lawyer had there been a recovery in the underlying litigation. *See, e.g., Alfred Carbone v. Tierney*, 151 NH 521, 864 A2d 308 (2004); *Andrews v. Cain*, 62 AD 2d 612, 406 NYS 2d 168 (1978).[9] Plaintiffs contend, in other words, that they had to pay Schwabe for legal services to recover from the Sunrise opponents and then had to pay their new lawyers to represent them in this action to recover the same thing.

Defendants respond that attorney fees paid to a negligent attorney are not recoverable as damages because the fees are not an injury imposed on the client by the attorney's

---

[9] The rule on which plaintiffs rely is not universal. *See, e.g., Horn v. Wooster*, 2007 WY 120, 165 P3d 69 (Wyo 2007).

negligence, and they summarily dismiss the "contingent fee bar" cases as inapplicable.[10] Although we briefly discuss plaintiffs' reliance on the "contingent fee bar" cases, like defendants, we focus closely on whether the fees that plaintiffs paid to Schwabe were a consequence of defendants' negligence. We conclude that they were not and, therefore, that they are not recoverable as damages in a legal malpractice claim in Oregon.

We begin by reiterating the last two elements of a legal malpractice claim: harm to the plaintiff, measurable in damages, and causation, *i.e.*, the cause-in-fact connection between the lawyer's negligence and the plaintiff's harm. *Watson v. Meltzer*, 247 Or App 558, 565, 270 P3d 289 (2011), *rev den*, 352 Or 266 (2012). Causation in fact refers to "but-for" causation. "That is to say, in order to prevail in a negligence action, a plaintiff must establish that *but for* the negligence of the defendant, the plaintiff would not have suffered the harm that is the subject of the claim." *Id.* (emphasis in original).

Applying those requirements of proof here to the claimed harm demonstrates why plaintiffs' position is incorrect under Oregon law. To recover the fees that they paid to Schwabe, plaintiffs must establish that they would not have paid Schwabe but for defendants' negligence—in other words, had Schwabe performed in accordance with the standard of care, plaintiffs would not have paid Schwabe any fees. Plaintiffs, of course, cannot prove that would have happened; had Schwabe performed in accordance with the standard of care, plaintiffs still would have paid Schwabe its fees.

We do not find the "pay twice for the same services" argument and plaintiffs' reliance on malpractice cases arising from a contingent fee matter to be persuasive in this

---

[10] Defendants also argue that plaintiffs suffered no prejudice, because the trial court ruled against them on the recovery of fees in equity and the jury rejected them as well on the claim for breach of fiduciary duty, in which part of their claim for fees was allowed to remain. We reject defendants "no prejudice" argument. The jury did not find liability on the breach of fiduciary duty claim, and the trial court was deciding a different issue—disgorgement as an equitable remedy.

case.[11] The rationale for not crediting the malpractice defendant for the contingent fee that would have been owed had the plaintiff prevailed in the underlying action is explained in *Alfred Carbone*:

> "[I]f the defendant is barred from reducing the verdict to reflect the contingency fee, the plaintiff is in the same position he would have been in if the defendant had performed competently in the underlying action. The plaintiff will still be required to compensate his or her new attorney for the services the attorney provided in pursuit of the malpractice action. The plaintiff, however, will not be penalized for having to employ two attorneys to get the result the plaintiff should have obtained in the original action."

151 NH at 534, 864 A2d at 319-20. However, even were we inclined to accept that rationale, it does not apply when, as here, plaintiffs may recover the lost attorney fees that they could have obtained from their opponents in the underlying action as damages. If plaintiffs obtain their fees in the Sunrise litigation from defendants, plaintiffs will be in the same position that they would have been in had defendants performed competently. That is so because, in that event, plaintiffs would have paid Schwabe and then sought recovery of their fees from the Sunrise defendants. The trial court did not err when it refused to allow plaintiffs to ask the jury to award the fees they paid to Schwabe as damages on the negligence claim.

To recap, the trial court erred by dismissing plaintiffs' allegation that defendants were negligent by failing to assert the oppression claim earlier in the Sunrise litigation and by submitting a verdict form to the jury that permitted them to conclude that Rowlett's interest in Sunrise could be valued on December 7, 2007. Defendants do not challenge the jury's verdict that they breached their duty of care to plaintiffs and were therefore negligent. Nevertheless, in light of the significant theory of negligence never tried, namely, that

---

[11] Some of those cases also imply a penalty for lawyers who commit malpractice by disallowing the hypothetical contingent fee as a credit against damages. In *Andrews*, the New York appellate court reasoned, in part, that to credit the defendant lawyer with the contingent fee "rewards his wrongdoing[.]" 62 AD 2d at 613, 406 NYS 2d at 169. However, rewarding or penalizing the defendant lawyer is not the basis for an award of damages in negligence.

defendants failed to timely allege an oppression or squeeze-out claim in the Sunrise litigation, we remand for a new trial on the negligence claim.

Affirmed in part and reversed and remanded in part.

**ARMSTRONG, P. J.,** concurring.

I agree with the majority that plaintiffs are entitled to a new trial on their negligence claim because the verdict form misled the jury regarding its consideration of damages, and I concur in the majority's ultimate disposition of the case. However, I write separately because, although I agree with the majority that the trial court erred in dismissing plaintiffs' specification of negligence on defendants' failure to timely assert an oppression or "squeeze-out" claim in the underlying litigation involving Sunrise Partners LLC (Sunrise), I disagree with the reasoning by which the majority reaches its conclusion.

In concluding that the trial court erred in dismissing plaintiffs' specification of negligence that defendants failed to timely assert an oppression claim in the underlying litigation, the majority relies on the proposition that, "even if * * * we or the Supreme Court [were] at some point to hold that an equitable claim for oppression in the LLC context is not cognizable in Oregon, defendants still could have breached their duty of care by failing to assert a colorable claim of oppression earlier in the Sunrise litigation." 262 Or App at 682. In other words, the majority concludes that, because an equitable claim for oppression was "colorable," and there was an evidentiary basis for such a claim, it is immaterial whether such a claim is, in fact, cognizable in Oregon, and the trial court thus erred in dismissing plaintiffs' negligence specification related to that claim.

I have several concerns with the majority's approach. First, it does not reflect the theory on which the issue was presented to the trial court or, indeed, argued to us on appeal. As the majority sets out, the trial court dismissed plaintiffs' specification of negligence regarding defendants' failure to assert a timely oppression claim based on the court's conclusion that plaintiffs could not prevail on that specification,

because oppression was not a legally viable claim. 262 Or App at 681. Thus, the parties and the court below understood the issue to reduce to whether liability for oppression (and a demand for a compulsory buyout) by a minority member is available in the context of an LLC and thus would have been available to plaintiff Rowlett against the other Sunrise members such that defendants could be negligent for having failed to timely assert the claim. The parties continue to square off over that question on appeal. The majority, however, entirely reframes the dispositive question, which reflects the sort of creative reimagining that we normally do not countenance. *See State v. Branstetter*, 181 Or App 57, 62 n 3, 45 P3d 137, *rev den*, 334 Or 632 (2002) ("[A]lthough it is axiomatic that we may affirm on grounds not argued to the trial court, there is no authority for the proposition that, without invoking 'plain error,' we can *reverse* the trial court on grounds not argued to it. Much less is there any authority that we can reverse on grounds not argued to *us*." (Emphasis in original; internal quotation marks and citation omitted.)). It also results in the unsettling proposition that a party may be held liable for malpractice for failing to assert a claim that is not, in fact, cognizable.

That said, I agree with the majority that we must reverse the trial court's dismissal of that specification of negligence. I do so because I am persuaded that an oppression claim *is* viable in this context, notwithstanding that Oregon's Limited Liability Act (the LLC Act) and, particularly, the statute governing dissolution of LLCs, ORS 63.661, does not contain express authority for such a claim.

I note first that the LLC Act itself does not specifically foreclose the availability of equitable remedies in the event of oppression of an LLC member. Moreover, although it does not speak to that point precisely, the legislative history of the LLC Act indicates that the legislature did not understand the LLC Act to be the exclusive and all-encompassing statement of the rights and liabilities of limited-liability companies. Rather, the legislature apparently understood that the LLC Act would be informed by both preexisting common-law principles and future judicial development. *See* 262 Or App at 683-85. And, at the time of the LLC Act's enactment, the Oregon Supreme Court had held, in the

context of a closely held corporation, that equitable remedies were available to a minority shareholder for oppressive conduct by majority shareholders in violation of their fiduciary duties, notwithstanding that, at the time, the only *statutory* relief available for that conduct was judicial dissolution. *Baker v. Commercial Body Builders*, 264 Or 614, 629, 631-33, 507 P2d 387 (1973) (citing *former* ORS 57.595 (1965), *repealed by* Or Laws 1987, ch 52, § 181); *see also Delaney v. Georgia-Pacific Corp.*, 278 Or 305, 310, 325, 564 P2d 277 (1977) (allowing equitable relief of buyout of plaintiffs' stock as equitable remedy for violation of fiduciary duty of joint venturer).

In light of that history and context, defendants' only argument for a contrary understanding—*viz.*, because the statute governing dissolution of corporations, ORS 60.661, expressly includes "oppressive conduct" as a basis for dissolution, see ORS 60.661(2)(b), the legislature must have purposefully omitted that authority from ORS 63.661 when enacting the LLC Act—carries little weight. The two statutory schemes were not enacted at the same time; nor am I aware of anything in the legislative history of the LLC Act to indicate that the legislature had in mind the provisions governing dissolution of public corporations when contemplating its enactment of ORS 63.661. Thus, the interpretive principle that the legislature's inclusion of a provision in one statute, while omitting it from another, suggests that the omission was purposeful, *see City of Mosier v. Hood River Sand*, 206 Or App 292, 309, 136 P3d 1160 (2006) (so stating), is not particularly persuasive here. In short, I am satisfied that, in enacting the LLC Act, the legislature did not intend to foreclose the availability of an equitable oppression or squeeze-out claim, resulting in a demand for a compulsory buyout or dissolution, by a minority member of an LLC. For that reason—and not the theory constructed by the majority—I would conclude that the trial court erred in dismissing plaintiffs' specification that defendants were negligent in not timely asserting such a claim.

I agree with the remainder of the majority's disposition of the issues.